Hamil, Appellant, *v.* Bashline.

*Henry S. Moore*, for appellant.

*George Hardy Rowley*, with him *Voorhies, Dilley, Keck, Rowley & Wallace*, for appellees.

OPINION BY CERCONE, J., June 14, 1973:

This case comes to us on appeal from a judgment entered in favor of the defendants and against the plaintiff on the trial judge's direction of a verdict for the defendants. Plaintiff, the administratrix of the estate of her deceased husband, brought this suit against defendants, trading as The Bashline Hospital Association, Ltd., for damages under the Wrongful Death Action and the Survival Action.

The facts established by the plaintiff at the trial are as follows: plaintiff called the Bashline Hospital around 11:40 p.m. on May 31, 1968, advising the night supervisor, Margaret Montgomery, that plaintiff's husband, the deceased, aged 41, was suffering from severe chest pains. Plaintiff was told by Mrs. Montgomery to bring him into the hospital, and that a doctor was there. The deceased was taken to the hospital at approximately 12:15 a.m. June 1, 1968. The doctor assigned to emergency duty was not there and could not be located. Doctor Johnston, one of the defendants, was present and although informed by the night supervisor of the deceased's condition did nothing more than order an EKG taken. The EKG machine did not function, apparently as a result of being plugged into a defective outlet. Its malfunction was confirmed by Dr. Johnston who ordered another machine be used and then he left the hospital. Another EKG machine was not located and the decedent, receiving no treatment, was then taken immediately by the plaintiff to the office of Dr. Saloom in Harrisville, Pennsylvania. A short time after his arrival and during the process of taking an EKG, the deceased died.

Dr. Saloom testified that the cause of death was myocardial infarction; that he came to this conclusion on the basis "of the history that the man presented; the symptoms that he had; the cardiograph tracings that I have." He testified that "any one in his age group, I

mean the first thing I think of is cardiac problems and it could be a muscular problem also. . . . But the first thing I have to rule out is coronary." He stated that when Mr. Hamil arrived that night "he was restless and he was having pain" and was pale, and that "it would be impossible to put a point in time at when the heart attack actually occurred." He said: "It could have occurred when he first had pain, could have occurred at the hospital; any point here in time from the onset of pain. The pain actually occurred from the anoxia to the heart and you can have pain without having a complete occlusion of the vessel without necrosis to the tissue." And again Dr. Saloom testified: ". . . when I first saw Mr. Hamil, just looking at him and taking his blood pressure and listening to his heart, I was not convinced that he wasn't having a heart attack. But by the same token I wasn't convinced that he was having one." Dr. Saloom further testified that the fact that decedent's pulse rate was regular "didn't swing me either way" and the fact that decedent's blood pressure was then within normal limits "didn't help in the diagnosis" and meant nothing because "the blood pressure in some heart attacks will drop immediately; the patient may become in shock and all and in other cases it may remain normal for several hours or several days."

Dr. Cyril Wecht[1] testified as an expert in behalf of the plaintiff and gave his professional opinion as to the

[1] Instructor in pathology at the University of Pittsburgh School of Medicine; Professor of Law and Director of the Institute of Forensic Sciences at Duquesne University, Pittsburgh; teacher of courses having to do with heart, cardiac disease, cardiac trauma, injury, its relationship to injury, etc.; lecturer at the Coronary Care Unit Teaching Program at the University of Pittsburgh Medical Nursing School on matters dealing with coronary care, particularly those with in-hospital, social and legal ramifications; Diplomate of the American Board of Pathology and certified by that Board in the specialty of anatomic and clinical pathology and

care that should have been afforded a patient who submits himself for care and treatment with the complaints made by the decedent: "In my opinion, he should have been immediately immobilized; that he should have been placed on a bed or a stretcher and kept there. He should have been seen immediately by a doctor; he should have had his pulse taken and his blood pressure read and a doctor should have listened to his chest with a stethoscope. He should have been given medication for pain, that is usually morphine or demerol with that kind of situation, something pretty strong. He might well have been given a sedative or a tranquilizer to further quiet him down and to allay his anxiety and apprehension because that's a very important element with somebody that has severe chest pains. And what you are considering, the very real possibility of a heart attack or an impending heart attack. An electrocardiogram should have been taken as quickly as possible; he should have been strapped with the electrodes and a tracing made so that they could see whether or not he was having a heart attack or his heart was being compromised from having inadequate oxygen from the blood supply . . . it's a rule of thumb, your Honor, if I may use that expression then. That such a gentleman is having these chest pains because of a heart attack or an impending

forensic pathology; member of Allegheny County and Pennsylvania Medical Societies and American Medical Association; member of the Pittsburgh Pathology Society and the Pennsylvania Society of Clinical Pathologists; fellow of the College of American Colleges and the American Society of Clinical Pathologists; Vice President of the International Association of Accident and Traffic Medicine; fellow and President of the American Academy of Forensic Sciences and American College of Legal Medicine, as well as other organizations; author of approximately sixty articles published in different journals and editor of annual Legal Medicine Manual; editor or editorial consultant to three or four other national and international publications.

heart attack and must be treated as such until that is ruled out. It may turn out to be other things but until that is ruled out that is the way he must be looked upon and that is why you give something to relieve the pain because the pain itself places a great demand on the body and increased burdens on the heart and that is why you give tranquilizers or sedatives because the anxiety or apprehension with severe pain places an increased burden on the heart and that is why you immobilize the patient so the heart has the last possible amount of work to do, no movement, nothing, literally no movement at all, not even to lift up a glass of water and that is why you take an electrocardiographic tracing so that you can determine in a matter of minutes, as soon as the tracing comes out on the paper and a doctor reads it whether or not there is a heart attack or an impending heart attack. That is why those things are routinely and uniformly done, in my opinion, in the kind of situation that you have asked me about. Q. What is the purpose of oxygen in connection with such treatment? A. The oxygen then is given to enrich the blood supply which has been compromised by the inadequate amount of blood being pumped out of the heart, if the heart, if for whatever reason is beating irregularly or because of death of part of the heart muscle due to the heart attack, then the body and the heart, itself, is not getting the oxygen that it needs and so the oxygen is artificially supplied through various means by the doctor."

There was testimony that defendant hospital did have available at the time the deceased was at the hospital certain facilities so recognized as standard treatment for a myocardial infarction including beds, oxygen, pain relieving drugs and equipment to effect defibrillation.

Dr. Wecht further testified as to the causal connection between Mr. Hamil's death and the defendant's

failure to accord him the treatment that should have been rendered: "A. In my opinion, the substantial chances that Mr. Hamil would have had for survival were terminated, were taken away from him by the failure by the initial hospital to have given him the kind of treatment and examination which he should have had under the circumstances that you have outlined. Q. Now Doctor, would you be able to give us a percentage of chance that was taken away from Kenneth Hamil? . . . A. Yes, Sir, I can, not to the exact decimal point but generally in cases of this kind based on my own experiences and my education and knowledge and things that I have studied in my field, and so on. In my opinion, I would be talking about a 75% chance of this man having survived if he had been given, immediately and initially the kind of treatment and diagnostic work-up that he should have received. Q. And that is the treatment that you have testified to here, briefly? A. What I said before, yes."

Dr. Wecht testified that the absent signs (such as normal pulse and blood pressure) would not cause him to change his opinion as to the treatment that should have been rendered decedent at Bashline nor his opinion as to the "chances for life in going to Dr. Saloom's office", because those absent signs "would only get to the matter of the diagnostic problem that Dr. Saloom would have faced in his office but they would in no way erase what had already been done. In other words, the failure to have immobilized him; the failure to have alleviated . . . eliminated desirably his pain and his apprehension and his anxiety and the failure to have taken that electrocardiographic tracing before so that medications could have been administered to stop the abnormal heart beat and so on. The fact and maybe again on your assumptions that blood pressure reading, a pulse reading might have been normal would in no way retroactively work to make up for the things

that had already been done which were wrong. Q. Well, would the presence of these new facts have any effect upon your opinion as to what should have been done by a physician or hospital practicing in accordance with the standards of Grove City, Pennsylvania? A. No sir. Because, as I say, the problem then would have been that the Doctor would be saying, well, I've got a normal pulse and normal blood pressure and now I have got to take that electrocardiogram. All the more reason now why the electrocardiogram becomes important and all the more reason why you have to do these other diagnostic studies and still treat the patient as a probable heart victim until proven otherwise." When asked, ". . . isn't it entirely possible that any EKG done on Mr. Hamil at the Bashline Hospital would have been entirely normal?", Dr. Wecht answered: "No sir, I don't believe so. In this case, the fact that Mr. Hamil died, the fact that the electrocardiogram at Dr. Saloom's office showed very specific and serious cardiac pathology and the fact that he had the chest pains of an unrelenting nature that he did, all indicate to me that if the electrocardiogram had been taken at the Bashline Hospital that it would have shown the same things or essentially the same things and would not have been normal." He was further asked: "Now suppose, Doctor, that a patient was seen that complained of chest pain that got better then got worse, had chest pain or pain in the peigastric area, is it your testimony that a physician who takes his pulse and finds nothing, sees nothing remarkable about his appearance, takes his blood pressure and finds it normal should in every case hospitalize that patient, immobilize him?" And again he answered: "Absolutely, that is what basic sound medicine is all about. You have a middle aged American male with chest pain or epigastric pain, I don't care if the blood pressure is normal or pulse is normal, you hospitalize and immobilize him and do an electro-

cardiogram because to do anything less than that is gambling with that man's life. This is just something that every school teacher, I don't care if it's osteopathic or medical, it's just basic. You don't gamble, you don't gamble on that side, you can always be wrong and the man can go home the next day. If it turns out to be indigestion you will not have lost anything but if it turns out to be a heart attack then he may have lost his life . . . * * * A man with chest pain, who is weak and pale. Now I'm talking about this case. Here is a forty-one year old guy who is a physical laborer and he has got severe chest pain and he is weak and he is pale and his wife wants to take him to the hospital, yes . . . you know, again, that man should have been hospitalized. I'm sorry, again, that's my answer, I can't change it."

The court below, after permitting the testimony of Dr. Wecht to be placed into evidence, reversed itself at the end of the trial and held that the testimony did not meet the standard of expert testimony requiring an opinion based on reasonable medical certainty that the death was in fact caused by defendant's failure to exercise reasonable care. The testimony was thereupon stricken from the record and the court granted defendant's binding instructions and directed a verdict for the defendant.

Plaintiff appellant contends that the court below in passing upon the sufficiency of Dr. Wecht's testimony, erroneously applied the standard requiring proof of causal connection by medical testimony that the death did in fact result from defendant's conduct. Appellant argues that under the provisions of Section 323 (a) of the Restatement 2d, Torts, proof of causal connection between the treatment and the death is sufficient where the medical testimony is that the risk of such death was in fact increased by defendant's conduct. We agree with appellant's interpretation.

Section 323 provides as follows: "§323. Negligent Performance of Undertaking to Render Services. One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking." Appellee argues that this section does not relieve plaintiff from proving, with reasonable medical certainty, as in other negligence cases, that the death was in fact caused by defendant's lack of reasonable care, and contends that subsections (a) and (b) merely provide *when* a duty to exercise care arises. We cannot agree. It is made clear at the outset of the section that the duty to exercise care arises when "one . . . undertakes, gratuitously or for consideration to render services to another which he should recognize as necessary for the protection of the other's person or things. . . ." The language of the subsections clearly reveals they were intended not to apply to scope of duty but to causal connection between the physical harm and defendant's failure to exercise reasonable care. Subsections (a) and (b) permit that causal connection to be proved by evidence that defendant's failure increased the risk of such harm as was suffered by plaintiff or by evidence that the harm was suffered because of reliance on the defendant's undertaking.

This conclusion that subsections (a) and (b) do not deal with scope of duty but relate to causation is consonant with the reasoning of the Supreme Court in *DeJesus v. Liberty Mutual Ins. Co.,* 423 Pa. 198 (1966), where the court stated at pp. 200-01: "Furthermore, even if we assume that a legal duty were owed by appellee to appellant by reason of an undertaking to render ser-

vices in developing safety techniques, there would still be no cause of action stated. . . . The import of that section (Section 323) is that negligent performance or nonperformance must increase the risk of harm and that there must be reliance by the injured plaintiff upon the defendant's performing the service he has undertaken to render. Appellant's complaint fails to aver or establish either element and sets forth no cause of action."

In *Brown v. Travelers Ins. Co.*, 434 Pa. 507 (1969), no issue was raised as to defendant's liability where the defendant's conduct was alleged to have increased the risk of the harm suffered by plaintiff, the court noting that only two issues were raised: (1) whether defendant had a duty to see that the area where appellant worked and the manner in which the work was done was safe, and (2) whether the employer's insurance carrier was subject to suit under the Pennsylvania Workmen's Compensation Act, the court deciding the case in favor of the carrier on this second issue. However, in the dissenting opinion reference was made to the sufficiency of the allegations of the plaintiff's complaint as a basis for recovery under subsections (a) and (b) of Section 323, the court comparing those allegations with the insufficient pleadings in the *DeJesus* case as follows: (at pp. 525-26) "Since DeJesus failed to allege an increased risk of harm or reliance upon the carrier's undertaking he was precluded from recovering *on that basis also*. Appellant's attorney in the instant case evidently did his homework, for the pleading deficiencies which precluded recovery in De-Jesus have been avoided here. Paragraphs 6, 7 and 8 of the amended complaint clearly set forth appellant's theory that appellee had assumed a duty by undertaking to render services in making the employer's premises safe, and that its negligent inspections or failure

to inspect had increased the risk of harm to appellant who had relied on appellee's program."

If a plaintiff could prove with a reasonable degree of medical certainty that the death was in fact caused by defendant's failure to exercise reasonable care for decedent's safety, there would be recovery under the common law rules of negligence without need of showing defendant's conduct increased the risk of such harm. As stated by Justice CARDOZO in *Glanzer v. Shepard,* 233 N.Y. 236, 239, 135 N.E. 275, 276 (1922), and quoted in the dissenting opinion in *Brown v. Travelers Ins. Co.,* supra (at page 529) : "It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all."

Here, the proof of causal connection does not rise to that degree required to sustain a recovery under the common law rules, and plaintiff must rely on Section 323 which is hereby expressly accepted as the law of Pennsylvania[1] and interpreted as allowing causal connection between the death and defendant's conduct to be proved by evidence that the risk of death was increased by defendant's failure to exercise reasonable care, the jury then being allowed to pass upon the weight and credibility of that evidence of increased risk of death in determining whether or not death was in fact caused by defendant's lack of reasonable care. The defendant is not, under Section 323, liable merely for having increased the risk of death, but the evidence of the increased risk of death is under subsection (a) of that section for the jury's consideration on the factual issue whether the death was caused by defendant's failure to use reasonable care.

---

[1] If it has not been already accepted as the law of Pennsylvania by the references made thereto in the prior cases of *DeJesus v. Liberty Mutual Ins. Co.,* and *Brown v. Travelers Ins. Co.,* supra.

It is our conclusion, therefore, that the court below erred in striking the testimony of Dr. Wecht, and in not permitting the jury to pass upon it in determining (1) whether or not the defendant under all the circumstances failed to exercise reasonable care in the rendering of medical services which it had undertaken to provide the decedent; and (2) whether or not such failure, which according to Dr. Wecht's testimony increased the risk of death, did in fact cause decedent's death.

We, therefore, reverse the judgment of the lower court and remand the case for a new trial consistent with this opinion.

JACOBS, HOFFMAN, and SPAULDING, JJ., concur in the result.