381 A.2d 975

**Margaret P. GRADEL, parent and natural guardian of Edwin J. Gradel, Jr., a minor, and Edwin J. Gradel, Sr., and Margaret P. Gradel, in their own right, Appellees,**

v.

**William Y. INOUYE, M. D., Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 6, 1976.

Decided Dec. 28, 1977.

394

396

John J. Dautrich, Philadelphia, with him White & Williams, Philadelphia, for appellant.

James E. Beasley, Philadelphia, with him Jeffrey M. Stopford, Philadelphia, for appellees.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

VAN der VOORT, Judge:

This is an action in trespass for medical malpractice brought by the mother and natural guardian of Edwin J. Gradel, Jr., a minor, on his behalf, and by his father and mother in their own right. A jury returned verdicts of $700,000 for the guardian of the minor boy and $25,000 for the parents. After a hearing on post-trial motions, the trial court refused to grant a new trial or to reduce the $700,000 verdict. However, it conditioned the denial of a new trial on the $25,000 verdict on its reduction to $10,000 by the filing of an appropriate remittitur. The remittitur was filed.

The defendant-appellant has appealed the judgment entered on both verdicts. The appellant seeks either a new trial because of asserted errors in the charge to the jury or, alternatively, a reduction in the amount of the judgment entered for the guardian of the minor.

On July 6, 1964, Edwin J. Gradel, Jr., then age 5, on whose behalf this action was brought by his mother, was injured by jumping out of a tree, fracturing both bones of the left forearm. Dr. William Inouye, a Board-certified general surgeon, X rayed the injured arm and set the fractures at Jean's Hospital in Philadelphia. No contention is made that the doctor's treatment of the fractures had anything to do with the complication that followed. The boy and his mother returned to the doctor on four occasions between the date that the fractures were set and October 31, 1964, when the lad was discharged from appellant's care. On three of those occasions X rays were taken of the fractures to observe the healing process. An X ray was not taken on the final visit when the boy was discharged.

On three occasions in the ensuing year, February, May and September, 1965, the boy's mother had him reexamined by Dr. Inouye because a lump of soft tissue had appeared at the fracture site and was gradually increasing in size. The doctor diagnosed the growth as a callous, a protective device of nature to shield the wound and not unusual under the circumstances, and prognosticated that it would gradually disappear as the fractures mended. On each visit the mother inquired of the appellant whether an X ray would be appropriate but the doctor declined the suggestion explaining to the mother that there was no evidence of pain, there was good motion and use in the arm, the rate of healing was not unusual and that he felt that further X rays might result in overexposure.

Dissatisfied, on November 20, 1965, the mother took her son to Dr. Oscar Corn, an orthopedic surgeon. At that time the growth of soft tissue at the site of the injury was about two inches above the surface of the skin. X rays were taken which disclosed that the fracture of the radius was well

healed and that the ulna was partially healed but with cystic changes on either side of the old fracture line. There was evidence that the growth tissue had invaded the bone at the point of this fracture. Dr. Corn then performed an excisional biopsy on November 30, 1965, which revealed a cancer of the bone, specifically a fibrosarcoma of low grade malignancy, quite unusual in small children. Dr. Corn thereupon did a second operation on January 16, 1966, to excise the middle two-thirds of the infected bone for about four inches and insert a graft from the fibula, the purpose of the operation being to excise any remaining tumor not removed by the excisional biopsy. There was no evidence of cancer cells at either end of the incision, leading to the conclusion that all cancer cells had been removed. As it turned out, this was not achieved for the cancer recurred at the same situs approximately a year later and on December 16, 1966, Dr. Corn amputated the boy's left arm above the elbow. The lad is right-handed.

The trial took place between February 24 and 27, 1975, in the eleventh year after the accident and eight years after the amputation of the arm. Between the dates of amputation and trial chest X rays of the boy have been taken at frequent intervals to determine whether there was any evidence that the cancer had metastasized and had thereby been transmitted by the bloodstream or lymphatics to some other part of the body. No evidence that the cancer had so spread was found in any of these examinations and Dr. Corn testified that, in his opinion, there had been no metastasis. However, he recommended continuing annual examinations against the possibility that the cancer might recur. He acknowledged the rule of thumb that if a cancer has metastasized it will reappear within five years in an adult and within two years in a child. Dr. Inouye testified that in 50 to 75% of the cases a low grade fibrosarcoma would recur at the original site. Dr. Corn testified that a low grade cancer such as the fibrosarcoma in this case was much more likely to recur at the original site than to metastasize. He declined to give a percentage estimate but testified that recur-

rence at the original site was common. However, it was Dr. Corn's opinion that the cancer had not metastasized at the time of amputation and would not reappear elsewhere in the boy's body. If cancer again struck the boy, now a lad of 18 years, there would be no way of determining whether it was a new cancer or the old one metastasized.

At the time of trial Edwin Gradel, Jr. was 16 years of age, in excellent health, extremely active, a high school sophomore holding a part time job. He had been fitted with a prosthesis which he had worn for a while, but which, by choice, he had not worn for the previous two years.

There was contradictory testimony as to the extent to which the young man's earning capacity had been restricted by the amputation. All witnesses agreed that Gradel could handle many jobs without diminution in earning power but that this was not true of all jobs open to him and that he would be handicapped somewhat both in obtaining and holding employment. The testimony most favorable to the Gradel claim was that his earning ability had been diminished by $6,000 a year averaged over his work expectancy of 47 years. The resulting estimate is a $282,000 loss of earnings which appellees calculated to have a present worth of $131,-838. Appellees' testimony also supported estimated medical expenses, past and future, of $47,606. The combined claim for loss of earning power and medical expenses aggregates $180,000. The balance of the award, some $520,000, can only be attributed to compensation for pain and suffering.

On the issue of pain and suffering, the young man testified to the taunts of his peers when he wore the prosthesis and also described the embarrassment and humiliation of adjusting to a life style without a left forearm. He gave no testimony as to any concern over the possibility of a recurrence of the cancer through metastasis.

At the conclusion of the court's charge to the jury, appellant's counsel sought to have the court issue supplemental instructions to the effect that the jury should not take into account any claim that the cancer may later be discovered to have metastasized. The request was denied.

The appellant challenges in four respects the correctness of the trial court's instructions to the jury. These issues are concerned with: (1) proof of appellant's negligence; (2) proof that appellant's negligence caused the amputation; (3) the possibility of metastasis as an element in the award; and (4) the refusal to charge on the non-taxability of the judgment.

1. *Negligence.* The issue of negligence was submitted to the jury in these words:

"Now, the burden of proof in a malpractice action is upon the plaintiff, to prove either, one, that the physician or surgeon did not possess and employ the required skill and knowledge or, number two, that he did not exercise the care and judgment of a reasonable man in like circumstances.

"Now, a physician or surgeon is neither a warrantor of a cure nor a guarantor of the result of his treatment, and there is no presumption or inference of negligence merely because the medical care provided by a physician terminated in an unfortunate result, which might have occurred even though proper care and skill had been exercised.

.    .    .    .    .

"If a physician as an aid to his diagnosis, that is, his judgment, does not avail himself of the scientific means and facilities opened to him for the collection of the best factual data upon which to arrive at his diagnosis, the result is not an error of judgment but negligence in failing to secure an adequate factual basis upon which to support his diagnosis or judgment.

"Malpractice consists of a negligent or unskillful performance by a physician of the duties which are devolved and incumbent upon him on account of his relationship with his patients or of a want of proper care and skill in the performance of a professional act.

"He is under a duty to use reasonable skill and diligence, and reasonable skill is that degree of skill which ordinarily characterizes the profession.

.    .    .    .    .

"Was Dr. Inouye's failure to take X-rays on those periods such a departure from established standards of practice as to justify a finding of negligence on the defendant's part?"

The testimony established that on three occasions between October, 1964, and November, 1965, Edwin Gradel, Jr. was brought back to Dr. Inouye for examination with respect to a growth of soft tissue at the site of the injury and that on each occasion Dr. Inouye diagnosed the growth as a callous which would disappear as the fracture healed. He did not have an X ray taken on any of these occasions for the reasons previously attributed to him.

Dr. Corn testified that in his professional judgment an X ray should have been taken, that it would not have been dangerous to the boy and that it might have led to an earlier discovery of the cancerous nature of the growth.

The jury was entitled to choose between these conflicting professional opinions and the verdict indicates that it favored the view of Dr. Corn that an X ray should have been taken. The trial court's instructions on this point correctly left it to the jury to determine whether this failure of Dr. Inouye to take an X ray on any of the three occasions in 1965 when the boy's mother suggested such a procedure amounted to negligence.

2. *Causal connection between negligence and amputation.* It does not follow, without proof, that the negligent action, or rather non-action of Dr. Inouye caused the amputation. The burden of establishing this causal connection rests with those who assert it, namely, the appellees. They attempted to make the causal connection by the testimony of Dr. Corn to this effect:

"Based upon those facts do you have an opinion whether there was a substantial possibility of survival of the arm had any other diagnosis been made?

"A   I believe so.

"Q   And what is that opinion?

"A   I believe if this tumor mass were discovered earlier, before it had invaded the bone, there is *a much greater likelihood* of it being removable, and thereby not necessitating the need for the amputation afterwards. (Emphasis added.)

"Q   Doctor, based on those facts do you have an opinion whether the failure to diagnose the tumor earlier, that is, in February or May or even October, was a substantial factor in the boy losing his arm?

. . . . .

"A   I believe it was.

"Q   That is your opinion?

"A   Yes."

Dr. Corn further testified—

"Q   Doctor, you have given an opinion that you thought there was a substantial possibility of saving the arm if earlier diagnosis had been made; is that your opinion?

"A   Yes, that is my opinion.

"Q   And by 'substantial possibility' what do you mean, more than fifty percent, somewhat less than fifty percent, a hundred percent?

"A   It depends on when this was picked up.

"If this tumor were picked up early, when the swelling was present, and the bone was not invaded, we had a very good chance that the bone was not involved, because the bone was involved later.   I can't give you percentages because it's a time matter.

"Q   When you say 'substantial possibility' you are just saying:  Depending upon the time?

"A   No.   I'm saying the fact is that this was not picked up until the bone was already invaded and, therefore, it was necessary to go through the steps that we went through and got the result we got.

"Q   I do not know whether you are answering my question or whether it can be answered, Doctor.

"When you say 'a substantial possibility' does that depend on when?

"A    It depends on when this tumor was picked up, how far it had extended and things like that."

It is to be noted that Dr. Corn could not say with any certainty that an X ray on any of the three dates when Dr. Inouye examined the growth would have led to a discovery of the cancer before it had invaded the bone.  Nor could he say that had it been discovered at this earlier date that it would not have recurred and thus required an amputation. Both Drs. Corn and Inouye testified that recurrence of such a cancer is common.  In summary, Dr. Corn's testimony was to the effect that an earlier examination would have improved the chances of avoiding amputation.

The trial court's charge to the jury treated Dr. Corn's testimony, if believed by the jury, as sufficient to establish Dr. Inouye's responsibility for the necessity of amputation. The court charged—

"There is no contention in this case, as I understand it, that the cancer, that is, the fibrosarcoma was caused by any conduct of the defendant.  However, the plaintiff is entitled to recover damages for all injuries which the defendant's negligence was a substantial factor in producing.  The defendant's negligence need not be the sole cause of the injuries; other causes may have contributed to producing the final result.  The fact that some other factor may have been a contributing cause of an injury does not relieve a defendant of liability, *unless you find that such other cause would have produced the injury complained of independently of his negligence.*"  (Emphasis added)

The net effect of this charge is that appellant's negligence should be treated as the cause of the amputation if it increased the likelihood that it would be required.  The jury was told that the causal connection between negligence and amputation was established unless they were satisfied that amputation would have been necessary independently of Dr. Inouye's negligence.  This effectively shifted the burden of proof from those asserting the causal connection to the defending doctor to prove that his failure to take X rays was

not the cause of the amputation. The charge was erroneous at this point.

This case was tried in February, 1975, a date subsequent to our decision in *Hamil v. Bashline (Hamil I)*, 224 Pa.Super. 407, 307 A.2d 57 (1973) but prior to *Hamil v. Bashline (Hamil II)*, 243 Pa.Super. 227, 364 A.2d 1366 (1976).

In *Hamil* we were dealing with a medical malpractice suit brought against a group of doctors trading as a hospital association because of delays in taking an EKG or administering treatment to a patient suffering from severe chest pains. The patient ultimately was taken to the office of another doctor where he died while an EKG was being taken. The estate of the deceased patient sued the hospital association for having caused the patient's death by its delay. The proffered proof that delay was the cause of death was the testimony of Dr. Cyril H. Wecht who attempted to connect the delay with the death by the following testimony (243 Pa.Super. at 231, 364 A.2d at 1368):

> "In my opinion, the substantial chances that Mr. Hamil would have had for survival were terminated, were taken away from him by the failure by the initial hospital to have given him the kind of treatment and examination which he should have had under the circumstances that you have outlined."

We added (243 Pa.Super. at 231, 364 A.2d at 1368):

> "Dr. Wecht testified that, in his opinion, given proper medical care, the decedent would have had a 75% chance of survival."

The trial judge struck out Dr. Wecht's testimony as inadequate to establish a causal connection between delay and death, and directed a verdict for the defendant. The trial court said in explanation of its ruling:

> "The testimony did not meet the standard of expert testimony requiring an opinion *based on reasonable medical certainty* that the death was in fact caused by defendant's failure to exercise reasonable care." (Emphasis added.)

On appeal in *Hamil I* this Court held that although the testimony was insufficient to prove that the negligence was the cause of death under normal standards for expert testimony, it was sufficient to allow the case to go to the jury under § 323 of the *Restatement (Second) of Torts (1965)*. That section provides—

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

"(a) his failure to exercise such care increases the risk of such harm, or

"(b) the harm is suffered because of the other's reliance upon the undertaking."

The trial court's instructions to the jury in the case at bar were consistent with our position in *Hamil I*. However, a second trial in the *Hamil* case resulted in another verdict for the defendant which was again appealed to this Court and reviewed in *Hamil II*. In *Hamil II* we overruled our decision in *Hamil I* and held that the defendant had been entitled to its directed verdict in the first trial because of the inadequacy of Dr. Wecht's testimony to establish the negligent delay as the cause of death with adequate certainty. Dr. Wecht was 75% certain but we held that was not sufficient.

We explained the rationale of our thinking in *Hamil II* as follows:

"(1) proof that a defendant's conduct increased the risk of harm is not, under § 323, proof that the conduct caused the harm; (2) § 323 does require proof of a causal connection between defendant's conduct and plaintiff's harm; (3) in this case, the requisite causal connection was not shown. (243 Pa.Super. at 231, 364 A.2d at 1368).

. . . . .

"If the only evidence of causation is expert testimony, and if the expert, with all his training and experience, can

only conclude that the conduct may have caused the harm, any conclusion as to causation on the part of the jury would necessarily be based on speculation. It must therefore be admitted that a jury cannot be permitted to find causation solely from expert testimony of increased risk. (243 Pa.Super. at 233–234, 364 A.2d 1369).

     .     .     .     .     .

"In addition to increasing the risk of harm, the conduct must have caused the harm. Therefore, we must decide whether appellant's expert testimony sufficiently met the causation requirement of § 323, i. e., whether it stated in sufficiently definite terms that the decedent's death resulted from appellees' failure to exercise reasonable care. (243 Pa.Super. at 234–235, 364 A.2d at 1370).

"In Pennsylvania, expert testimony evidencing a causal link must conform to a standard of certainty. '[A]n expert witness [must] testify not that the injury in question which have been or even probably was caused by the alleged negligence, but . . . that in his professional opinion the result in question came from the cause alleged.' *Houston v. Canon Bowl, Inc.,* 443 Pa. 383, 386, 278 A.2d 908, 910 (1971). *See also McMahon v. Young, supra; Niggel v. Sears-Roebuck & Co.,* 219 Pa.Super. 353, 281 A.2d 718 (1971). (243 Pa.Super. at 235, 364 A.2d at 1370).

     .     .     .     .     .

"In this case, Dr. Wecht, an eminently qualified physician, testified unequivocally that the hospital's failure to provide the decedent with the kind of treatment that he should have had under the circumstances demonstrated an absence of reasonable care. He also testified unequivocally that the decedent's substantial chances for survival were terminated by the hospital's failure to provide him with that treatment. Finally, Dr. Wecht testified that, even given proper treatment, it is not certain that the decedent would have survived. According to Dr. Wecht, he would have had only a 75% chance of survival.

"The crux of appellant's position is that the decedent died because appellees unreasonably failed to save him.

Appellant is not attempting to show that the decedent's death was affirmatively caused by appellees, but rather that his life was not saved as a result of appellees' negligent conduct. In this context, an expert would have to testify that, given proper medical treatment, Mr. Hamil would have survived. Dr. Wecht did not so testify.

"It may be that no expert can ever testify that a person would have survived a heart attack. If it is wrong to forbid recovery under such circumstances, then the fault lies not within the requirement that expert testimony be certain, but within the requirement that there be a causal link between defendant's conduct and plaintiff's harm. If causation is to be regarded as an element of a cause of action for negligence, then expert testimony must meet a standard of certainty. The expert testimony in this case did not meet that standard and was properly stricken." (243 Pa.Super. at 235-236, 364 A.2d at 1370).

It is unfortunate that the case now under review was tried in the interval between *Hamil I* and *Hamil II* for it not only deprived the trial court of the guidelines of *Hamil II* but gave it the false assurance found in *Hamil I* that an increase in the risk of injury was sufficient evidence to permit a jury to find that the increased risk had, in fact, been a cause of the injury.

Dr. Corn's testimony, previously quoted, fails more clearly than Dr. Wecht's to meet "a standard of certainty". He could not say that a diagnosis of cancer at any of the dates when the boy was brought to Dr. Inouye would have permitted removal of the cancer at that time without a later recurrence and consequent amputation. He could only say that the chance of such a result would have been improved.

The trial court's direction to the jury, based as it was on the reasoning of *Hamil I*, was erroneous in permitting the jury to find the appellant's negligence responsible for the amputation simply because delay in taking an X ray had increased the risk. More than that, the charge of the trial court incorrectly shifted the burden of proof to the appellant

by sanctioning a verdict for the appellees unless the appellant affirmatively proved that the amputation would have been required in any event.

■ Appellant's request 14 A for a charge to the jury, which was refused, should have been granted. It read as follows:

"14 A. The burden of proof is on plaintiff to establish that negligent treatment by defendant caused the injury complained of. *Fye v. Sharp,* 319 Pa. 545, 546 [118 A. 510] (1935). Plaintiff's expert is required to testify on causation in categorical terms and must state that in his opinion the act or omission charged against defendant caused the injury and any consequences thereof and that if a different course of treatment had been followed, the injury would not have occurred. *Florig v. Sears, Roebuck & Co.,* 388 Pa. 419, 428 [130 A.2d 445] (1957)."

3. *Metastasis.* We turn next to the issue of metastasis which would appear to have been a significant factor in the size of the $700,000 verdict. In the closing argument of appellees' counsel, emphasis was given to the mental anguish that Edwin Gradel, Jr. would suffer for the rest of his life because of the fear of metastasis. His argument was in the following words:

"Think of the mental anguish that he has gone through. He may be 16 but he knows it's cancer. When you consider this, and we talk about it in the past, consider it in the future.

"Do you know the anguish that an average ordinary person must go through when the diagnosis of cancer is made? 'What's the next x-ray film going to show? And the next one and the next one?'

"The anxiety and apprehension of living literally as a living time bomb: Do I have my 58 years to live or do I have 5? Thank God he has put 9 behind him and I hope and pray that he gets his full 58 years, but that doesn't change the anxiety that this boy must go through every time. Can you imagine going to a doctor's office at the end of the year to have an x-ray film, and the anxiety

that must take over when you are waiting for somebody to read that film and hoping that the radiologist walks out into the waiting room with a smile on his face? That's mental anguish. He is entitled to a separate sum for that, folks, to this figure.

. . . and x-rays every year for the rest of his life, he is going to have to have those films done, and the other thing, folks: We have a 9 year passage period and I hope that that's the end of this cancer, but what if it isn't? How do you know? How do you judge that? You are going to have to figure that out in the jury room, because you have to judge the future of this man.

"I think you ought to at least think about it, what may happen in the future, all of these items of damages he will have."

Appellant attempted to counter this argument by requesting the court to charge the jury—

"That since there was no evidence that the defendant caused the cancer, or that his treatment increased the risk of metastasis to some other part of the body, the jury must not take into account any claim that the cancer may later be discovered to have metastasized."

The motion was denied.

█ On the basis of undisputed evidence, the jury should have been instructed that the young man was entitled to no recovery based on the possibility of a later metastasis. This case was tried more than ten years after Edwin Gradel, Jr. broke his arm and more than eight years after the amputation. Appropriate X rays have been taken periodically since the amputation and no evidence of a recurrence of the cancer elsewhere in the body has been discovered. Dr. Corn testified that in his opinion the cancer had not metastasized although he added the guarded prognosis that X rays should continue to be taken as a precaution. He acknowledged the commonly accepted rule of thumb that if a metastasis takes place it will occur within two years in a child and within five years in an adult, although he had read of cases where it had occurred much later. The testimony of the victim on the

issue of pain and suffering was limited to incidents of his early youth when he was subjected to comments and occasional taunts of his peers. He made no mention of any fear of metastasis, an understandable frame of mind in view of the substantial lapse of years since his amputation. The standard of certainty established by *Hamil II* would rule out any claim for damages based on metastasis or the fear of metastasis on the facts of this case.

■ Additionally, the argument to the jury by appellees' counsel on this issue called for an appropriate correction by the court. It was said in *Glasco v. Green,* 273 Pa. 353, 117 A. 79 (1922)—

> "The effect of the improper statements was probably greater because they were neither withdrawn by counsel nor corrected by the court. In *Bullock v. Chester and Darby T. R. Co.,* 270 Pa. 295, 299, 113 A. 379, we said: 'Where counsel in addressing the jury makes an unfounded claim for damages, which the presiding judge on request fails to correct, the verdict should be set aside, although the true measure of damages may appear in the general charge.'"

4. *Taxability of award.* The final issue to be considered relates to the refusal of the trial court to advise the jury that an award would not be subject to federal income taxes. The requested instruction was as follows:

> "The Court does not know whether you will find for the plaintiff or for defendant. If you make an award to plaintiff, the award will not be subject to Federal Income Taxes and you should neither add nor subtract taxes in fixing the amount of any award. *Domeracki v. Humble Oil and Refining Co.,* 443 F.2d 1245, 1251 (3d Cir. 1971)."

The authority for such an instruction is found in the decisions of the Court of Appeals for the Third and Ninth Circuits: *Domeracki v. Humble Oil and Refining Co.,* 443 F.2d 1245, 1251 (3d Cir. 1971); *Burlington Northern Inc. v. Boxberger,* 529 F.2d 284 (9th Cir. 1975). In *Burlington Northern* the court said (p. 297):

"The benefits of informing the jury of the true tax consequences are so clear, and the burden in terms of time and the possibility of confusion so minimal, that we believe the balance is overwhelmingly in favor of giving such an instruction."

This conclusion is elaborated upon in *Domeracki* where Judge Aldisert, speaking for a unanimous court, concluded:

"The avowed purpose of such a request is to discourage a jury from enlarging an award to the extent it erroneously believes that the plaintiff will be called upon to pay income taxes.

.    .    .    .    .

"The instruction requested in this case would not require the introduction of any additional evidence. No reference to any IRS regulation or to any specific statute would be necessary. No tax expert would need be summoned as a witness. No tax tables would be hauled into the courtroom. No additional computation would be required. In brief, such an instruction would not open the trial to matters irrelevant to traditional issues in personal injury litigation, and thus would in no way complicate the case or confess the jury.

.    .    .    .    .

"The very purpose of a cautionary instruction is merely to dispel a possible misconception in the minds of the jury that government will make a valid claim to a portion of the award. Its effect is simply to dissuade juries from improperly increasing the award because of this mistaken belief.

"Given the absence of complications that an instruction would engender, the tax consciousness of the American public, and the general lack of knowledge about the statutory exclusion, we hold that in personal injuries actions the trial courts in this Circuit must, in the future, upon request by counsel, instruct the jury that any award will not be subject to federal income taxes and that the jury should not, therefore, add or subtract taxes in fixing the amount of any award." (pp. 1250-1251)

412

The weight of authority is against taking income tax into consideration in fixing damages in personal injury or death actions, *63 A.L.R.2d 1393*, and *Girard Trust Corn Exchange Bank v. Philadelphia Transportation Co.*, 410 Pa. 530, 538, 190 A.2d 293, 298 (1963) puts the courts of this Commonwealth in that category. It was held in *Girard* that a trial court should not have instructed a jury that in fixing damages income taxes should be deducted from the gross earnings of the decedent. The court, in explanation of its ruling, said:

"The question is one of first impression in Pennsylvania. The majority rule in the United States is that in fixing damages for the determination of decedent's earning capacity, the income tax consequences of the matter should not be taken into consideration. See, 'Propriety of taking income tax into consideration in fixing damages in personal injury or death action,' 63 A.L.R.2d 1393. This, in our opinion, is based upon sound legal reasoning and is now announced as the rule to be followed in Pennsylvania. Any other rule would lead to incongruous results."

The principal justification for this ruling as gleaned from decisions in other jurisdictions would appear to be the feeling that it would unduly complicate a jury's task if it were compelled to compute income taxes in determining a victim's lost earning capacity.

■ However, the request in this case and the one approved in *Domeracki* is the converse of the ruling in *Girard* and does not have a similar complication. Most jurors would know from their own experience that ordinary income is taxable and *Domeracki* would tell them that an award of damages is not taxable, something they are not otherwise likely to have known, but that the jury should not add or subtract taxes either to the calculation of lost earnings or to its award. We find no inconsistency between *Domeracki* and *Girard*. However, in view of the fact that this ruling is a departure from previous practice, it should not be regarded as mandatory in any cases tried before this date.

Judgment Reversed and case remanded for a new trial.

WATKINS, President Judge, concurs in the result.

PRICE, J., files a concurring opinion.

HOFFMAN, CERCONE and SPAETH, JJ., dissent on the basis of Judge Cercone's Dissenting Opinion in *Hamil v. Bashline II*, 243 Pa.Super. 227, 364 A.2d 1366 (1976).

PRICE, Judge, concurring:

I join and support the majority opinion in its conclusions as to (1) *Negligence* (2) *Causal connection between negligence and amputation* and (3) *Metastasis.* I cannot, however, agree with its conclusion on (4) *Taxability of award.* Defense attorneys have pressed for years for the adoption of the majority's conclusion that juries be permitted to consider the federal tax exclusion in fixing personal injury damages. Their argument primarily is that such advice to a jury would tend to eliminate the assumed windfall that they claim damage recipients presently enjoy under the exclusion. It seems to me that there is no validity to this claim, and further that the whole tax matter is peripheral to the litigation. It is not persuasive to me that the Court of Appeals for the Third Circuit has, in *Domeracki v. Humble Oil & Refining Co.*, 443 F.2d 1245 (3rd Cir. 1971) opined to the contrary. Indeed, the Court of Appeals for the Fifth Circuit, in *Greco v. Seaboard Coast Line Railroad Co.*, 464 F.2d 496 (5th Cir. 1972) has reached a directly contrary conclusion to *Domeracki, supra.*

And regardless of the conflicting federal decisions, I believe in *Girard Trust Corn Exchange Bank v. Philadelphia Transportation Co.*, 410 Pa. 530, 190 A.2d 293 (1963), the Pennsylvania Supreme Court has clearly placed Pennsylvania with the majority view in the United States that in fixing damages the income tax consequences are peripheral matters that should not be taken into consideration. It is true that there is not a holding that a trial court should not mention income tax consequences, but to me such a conclusion is inescapable from that portion of the *Girard Trust* case quoted by the majority. The clear import, and thus the law in Pennsylvania, is that income tax consequences are not

to be considered in fixing damages and that the incidence of income tax as it relates to such damages should not be mentioned at all in the instructions to the jury, nor in argument of counsel.

I therefore conclude, contrary to the majority, that in this respect the lower court was correct in refusing the requested charge.