393 A.2d 853

**Robert J. ROBERT, Appellee,**

v.

**Richard J. CHODOFF, M.D., Jefferson Medical
College Hospital.**

**Appeal of JEFFERSON MEDICAL COLLEGE HOSPITAL.**

Superior Court of Pennsylvania.

Argued June 14, 1978.

Decided Oct. 20, 1978.

336

338

A. Grant Sprecher, Philadelphia, for appellant.

S. Robert Levant, Philadelphia, for appellee.

Before JACOBS, President Judge, and HOFFMAN, CERCONE, PRICE, VAN der VOORT, SPAETH and HESTER, JJ.

PER CURIAM:

Appellant hospital seeks to overturn a jury verdict in appellee's favor in a medical malpractice action. In order to accomplish this purpose, appellant raises the following broad contentions for our consideration: (1) appellee did not introduce sufficient evidence to support the submission of alternative theories of negligence to the jury, (2) the lower court's charge misstated the law of proximate cause and burden of proof, distorted the evidence, and confused the jury, (3) the lower court thwarted appellant's presentation of its primary defense, and (4) the $800,000 jury verdict was excessive. We find these contentions unpersuasive.[1] Ac-

---

1. Under each general contention, appellant raises a host of more specific contentions. We also reject each of these contentions.

cordingly, we affirm the lower court's order denying appellant's post-verdict motions.

On June 18, 1965, appellee filed a complaint in trespass against appellant hospital and Dr. Richard J. Chodoff in the Philadelphia County Court of Common Pleas. Put simply, the complaint alleged that the defendants' negligence in performing a trans-thoracic vagatomy operation on appellee on November 4, 1963, and in rendering inadequate post-operative care resulted in serious brain damage to appellee. Over the next ten years, the parties engaged in an unremitting pleading and discovery battle. On May 21, 1975, a jury trial finally commenced before Judge CARSON, in the Philadelphia County Court of Common Pleas.

The following facts emerged at trial. On November 17, 1962, beset by a bleeding ulcer, appellee entered appellant hospital. Dr. Chodoff performed a partial gastrectomy in order to correct appellee's problem, and appellee left the hospital on December 22, 1962. However, massive bleeding from a marginal ulcer developed during the next year. Consequently, appellee reentered Jefferson Hospital on October 25, 1963. On the morning of November 4, 1963, Dr. Chodoff performed a trans-thoracic vagatomy; this elective operation entails cutting through the patient's chest and side in order to sever a vagus nerve, thus decreasing the acidity contained in the stomach. After removing the ulcer, Dr. Chodoff closed and sutured the incision.[2] After the operation, Dr. Chodoff issued 11 post-operative orders; one order required the checking and recording of the patient's vital signs—including temperature, pulse, respiration rate, and blood pressure—every 15 minutes for one hour and thereafter every hour for ten hours. Despite this order, appellee's temperature was recorded only four times on his graphic record dated November 4, 1963.

2. Appellee's expert witnesses all agreed that Dr. Chodoff performed a competent and sterile operation. Because appellee failed to introduce any evidence of Dr. Chodoff's negligence, the lower court granted the doctor's motion for a non-suit at the conclusion of appellee's case.

On the afternoon of November 4, 1963, appellee's mother-in-law and his wife visited appellee in his hospital room. According to these two witnesses, they found appellee in distress and desirous of having his blood-soaked bandage and bedclothing changed. After appellee's wife departed to locate a doctor, a nurse allegedly entered appellee's room. Appellee's mother-in-law informed the nurse of appellee's discomfort; in response, the nurse, apparently in a hurry to go to dinner, allegedly " . . . went to the window and took kleenex out of a box that was not his, and stuffed it down into the incision. . . . " Appellee's wife testified that upon her return to her husband's room, she observed a kleenex tissue protruding from his bandaged area. At some point in the later morning or early afternoon of November 5, 1963, Dr. Chodoff entered a progress note into the hospital record; he observed that appellee's blood pressure had unexpectedly fallen to 85 systolic, perhaps as a result of some bleeding from the ulcer. Also on November 5, 1963, Dr. Chodoff ordered that his patient receive an injection of penicillin and streptomycin as well as an aspirin suppository every four hours if his temperature exceeded 100 degrees. Dr. Chodoff specifically directed that appellee's temperature be taken every four hours. At trial, however, he stated that a nurse would not awaken a sleeping patient in order to check a temperature and to administer aspirin suppositories.[3]

Appellee's graphic record indicates that his temperature was 102.2 at noon on November 5th. At 4:00 p. m., his temperature was 101.4. However, the graphic record does not contain entries of appellee's temperature at 8:00 p. m., on November 5th, midnight, or 4:00 a. m., on November 6th. At 8:00 a. m., on November 6th, a nurse registered appellee's temperature at 105.2 on the graphic record. During the 16 hour hiatus between 4:00 p. m., on November 5th, and 8:00 a. m., on November 6th, someone made multiple entries of appellee's pulse, respiration rate, and blood pressure in the

3. According to Dr. Chodoff, the purpose of administering an aspirin suppository is to relieve a patient's discomfort; awakening a sleeping patient would defeat this purpose.

graphic record. Appellee also received aspirin suppositories at 10:45 p. m., on November 6th, and 2:00 a. m., and 6:00 a. m., on November 6th.[4]

Dr. Chodoff and Margaret Summers, for 20 years a head nurse at Jefferson and at the time of trial a supervisor of the hospital's staff development, testified that hospital procedure required that a nurse at Jefferson would take a patient's temperature and vital signs and then immediately record this information as well as any other pertinent observations in a nurse's notebook. According to Ms. Summers, immediate recording in this notebook protected against a memory lapse before the nurse transferred the information to the graphic record kept outside the nurse's station. According to Dr. Chodoff, transfer of the information contained in the nurse's notes to the central graphic record was essential because a doctor visiting a patient at Jefferson would first consult the centrally located chart to ascertain the patient's progress and current condition. At trial, neither appellant nor appellee could produce any nurse's notes containing a recording of appellee's temperature between 4:00 p. m., on November 5th, and 8:00 a. m., on November 6th. Furthermore, neither party produced a witness who could testify that appellee's temperature either was or was not taken during this time period.[5]

At 8:00 a. m., on November 6th, a nurse took appellee's temperature and recorded it at 105.2 degrees in the graphic record. At 10:45 a. m., after the administration of aspirin, appellee's temperature registered 106 degrees. At this time,

4. A progress note entered in the hospital record at 5:30 p. m. on November 5 is the only other recorded medical observation during the 16 hour period. This note stated that appellee's bowels were not making any noise and that his abdomen was distended. Dr. Chodoff was notified, and he ordered that appellee not receive any further medication with food by mouth. At trial, Dr. Chodoff denied that this progress note constituted evidence of an incipient infection or fever.

5. The nurse on duty the night of November 5, and the early morning of November 6, died sometime before trial.

a resident named Gosin [6] examined appellee and made the following entry in the hospital progress notes: "Huge area of erythema [redness], marked induration [swelling] around chest wound and spreading up to left shoulder and down in left flank. Some crepitation [as a result of either gas bascillus infection or subcutaneous emphysema air gets underneath tissue and causes it to bubble] over this area. Foul-smelling bloody material aspirated. Sent for stat gram stain. Rapidly spreading cellulitis [infection of soft tissue under skin] and/or myositis [infection of muscle] appears to be present. The problem appears quite serious. Will await gram stain report [gram stain helps to determine the group of bacteria present]." The next entry in the progress notes, again made by Dr. Gosin, states: "Many gram positive rods and chains. Typical picture of clostridial cellulitis and myositis. [A clostridial infection is an anaerobic infection present in traumatic wounds where the tissue is devitalized.] Will begin treatment." Dr. Gosin's final entry on November 6th states: "At 1:00 p. m., patient became hypotensive. Levophed started. [Levophed, a drug, was employed to counteract appellee's plummeting blood pressure.] Skin test for gasgangrene antitoxin administered. If this is negative we will start the antitoxin. [Antitoxin is a serum used to combat clostridia-produced toxin.] The patient's condition appears very poor at this point."

Sometime after 1:00 p. m. and before 2:00 p. m., on November 6, Dr. Chodoff arrived at appellee's bedside and immediately observed that appellee's life was in danger. Within 30 seconds, Dr. Chodoff diagnosed the problem and began treatment. Because of the gravity of the situation, Dr. Chodoff operated in appellee's room instead of removing him to an operating room. The doctor administered local anesthetic, opened the patient's trans-thoracic incision, and then made new incisions above and below the trans-thoracic incision; this procedure allowed oxygen to reach the tissues. Dr. Chodoff also sutured catheters into place for the purpose

6. Gosin did not testify, and no one could identify his status at the hospital in November, 1963, in any more descriptive fashion than "resident."

of irrigating appellee's tissues with peroxide, thus bringing more oxygen into the critical area, and evacuated large amounts of gas and foul fluid. Dr. Chodoff's bedside operation saved appellee's life.[7]

Appellee suffered through a turbulent recovery period after the emergency operation. He received antitoxins for gasgangrene, massive doses of penicillin to combat the fever and infection, and L'neosynephrine to maintain his blood pressure. On the fifth day after Dr. Chodoff's emergency surgery, appellee began to hallucinate,[8] and on the sixth day, his condition became semi-stuperous. Appellee's memory and recall became impaired, his thinking disjointed, and his perception of time disoriented. Thereafter, during the remaining four weeks of his hospitalization, hospital personnel gradually controlled appellee's infection and fever. On December 7, 1963, appellee left Jefferson Hospital.[9]

After his discharge, appellee's personality and behavior underwent a gradual, but complete change. He became an introvert and an undependable employee in his job as a number one pumper at a Gulf Oil Company refinery in Philadelphia. When a company doctor attempted to induce appellee to return to work after a period of sickness, appellee concluded that his doctor was conspiring against him, and the doctor concluded that appellee was psychoneurotic. In June, 1965, appellee sought the assistance of the psychiatric service of the Veterans Administration Hospital; doctors at this institution concluded that appellee was schizophrenic. On June 21, 1965, appellee, only 47 years old at the time,

7. Again, appellee failed to present any evidence of Dr. Chodoff's alleged negligence. *See* note 1, *supra*. Consequently, the lower court granted a non-suit as to Dr. Chodoff. Indeed, all the evidence in the record clearly demonstrates that Dr. Chodoff performed admirably in a stress situation of the highest magnitude.

8. For example, appellee imagined conversations with his long deceased father; he accused doctors of plotting to kill him; and he believed that a basket in his room had been placed there for the purpose of storing his body.

9. Barring complications, a patient would ordinarily leave a hospital seven to ten days after a trans-thoracic vagatomy operation; appellee's stay exceeded this period by three to four weeks.

quit his job for no apparent reason.[10] During the course of the next ten years, appellee's psychiatric condition continuously deteriorated; an addiction to Doriden, a drug prescribed after his 1963 hospitalization in order to tranquilize appellee, complicated his psychiatric problems, and required hospitalization at Lankenau Hospital in October, 1970. As appellee became increasingly more paranoid, he began locking his wife in their apartment, nailing the apartment windows shut, and arming himself with Japanese World War II souvenirs. He even accused his mother of attempting to poison him and finally turned on his wife, thus forcing her to leave him. When his wife refused to return unless appellee secured psychiatric assistance, appellee made an appointment to receive treatment. However, on January 22, 1973, the day of his appointment, appellee stuck a knife into his epigastrium; he received emergency treatment at Lankenau Hospital. On January 24, 1973, appellee was transferred to Philadelphia Psychiatric Center where he exhibited gross psychomotor retardation and experienced severe auditory hallucinations. Finally, in April, 1975, a battery of neurological tests, including an electroencephalogram and a CAT brain scan test, revealed that appellee definitely suffered from an irreversible organic brain syndrome.[11]

While the parties at trial did not seriously dispute the severity of appellee's structural brain disease, they did vigorously contest the issues of the hospital's alleged negligence and the cause of appellee's present disability. Both sides presented several expert witnesses who offered the following opinion testimony.

10. By quitting, appellee forfeited all his rights under the company pension plan. If he had continued his employment for only three more years, appellee's pension plan rights would have vested.

11. More specifically, the CAT brain scan test disclosed that appellee suffered from moderate dilatation of the ventricular system as well as the sulci and fissures; this finding is compatible with the presence of moderate brain atrophy. The electroencephalogram suggested bilateral structural abnormalities, especially prominent over the left hemispherical lobe.

Dr. William Ober, professor of pathology at the Sinai School of Medicine, assumed the truth of the testimony concerning the nurse's placement of the kleenex in appellee's wound. Calling this act a flagrant violation of the standard of care expected of a nurse, Dr. Ober concluded that the kleenex incident was the only rational medical explanation of the presence of the clostridia germs inside the incision.[12] While he believed that the kleenex incident caused the infection, Dr. Ober cautioned that the infection did not alone cause the ensuing brain damage. Instead, Dr. Ober testified that the infection caused high blood temperatures which, in turn, would cause brain damage in a significant number of patients if sustained over a two or three hour period. The longer the high temperature lasted, the more likely became the possibility of brain damage. Thus, Dr. Ober concluded that appellee could well have suffered brain damage as a result of the extended period of high body temperature between 8:00 a. m., and Dr. Chodoff's emergency operation.

Dr. Elliot Mancall, Chief of Neurology at Hahnemann Hospital in Philadelphia, opined that appellee's ". . . neurological problem dates initially to damage to the brain as a result of extremely high body temperature, coupled with a very low blood pressure, with, perhaps, in all likelihood, some intensification of his neurological problem as a result of a combination of later factors, including alcohol, possible Doriden, and some of the more recent tranquilizers which have been used." Specifically, Dr. Mancall testified that appellee's body temperature of 105 degrees or over on November 6, in conjunction with his perilously low blood pressure readings,[13] killed nerve cells in his brain, thus resulting in its shrinkage and in permanent damage.

12. Dr. Ober and Dr. Chodoff both testified that they had never encountered a single case of a clostridial infection complicating a trans-thoracic vagatomy operation.

13. Dr. Mancall noted that at 8:00 a. m., on November 6, 1963, appellee's blood pressure was recorded at 90 over 60; by noon on that day, appellee's blood pressure had dropped to the level of 60 over 0.

Dr. Kenneth Kool, a psychiatrist, buttressed Dr. Mancall's testimony that appellee's brain-damaged condition stemmed from his elevated temperature and deflated blood pressure which, in turn, stemmed from clostridial infection. Furthermore, Dr. Kool testified that appellee's brain injuries had engendered serious psychiatric problems. These problems caused appellee to quit work in June, 1965, and made him unemployable thereafter. Finally, appellee's psychosis would require continuous treatment and medication in the future to allow appellee to endure life.

Appellant also presented an imposing array of expert witnesses who proffered a different explanation of appellee's brain disease. Dr. Joseph Slap, a clinical professor at Hahnemann Medical College and an expert in clinical pharmacology and psychosomatic diseases, testified that appellee's brain damage resulted from ". . . Wernicke-Korsakoff's Syndrome, . . . a disease which is seen almost exclusively in alcoholics."[14] In reaching this conclusion, Dr. Slap assumed that appellee had exhibited a past history of heavy drinking.[15] Dr. Slap also directly attacked Dr. Man-

14. More specifically, Wernicke-Korsakoff's Syndrome, according to Dr. Slap, is a nutritional disease caused by the absence or deficiency of Vitamin B.

15. The record contains the following evidence suggesting a past drinking problem: (1) appellee's admission report to Jefferson Hospital in 1963 related that appellee was a "heavy drinker," (2) a Jefferson doctor who examined appellee prior to his 1963 operation noted that appellee had recovered well since the 1962 operation, "except for drinking," (3) appellee's discharge summary from the Philadelphia Psychiatric Center in 1973, mentioned a past history of drinking, (4) appellee's discharge summary at Lankenau Hospital in 1973, indicated a long history of psychiatric problems, including a paranoid state, as well as a problem of drug and alcohol abuse, (5) appellee told Dr. Mancall in 1975 that he had a history of drinking prior to 1963 and that he resumed drinking in 1972, and (6) appellee's wife testified that appellee drank socially and only in moderate amounts prior to 1963; from 1963 until 1972, he abstained completely. We also note that appellant erroneously finds evidence of past alcohol abuse in a psychiatrist's notes dated October 1, 1970. According to these notes, appellee suffered from Doriden withdrawal; this condition raised problems, including delirium tremens *similar* to alcoholism. This note furnishes no basis for a finding of alcoholism; it only substantiates appellee's condition of Doriden addiction.

call's conclusions that the conjunction of hyperthermia and low blood pressure caused appellee's brain damage and pointed out that Dr. Mancall's original diagnosis named Wernicke-Korsakoff's Syndrome and appellee's alcoholic past as the likely culprits.[16]

Dr. Herbert S. Heineman, Director of the Infectious Diseases Division of Hahnemann Medical College and Chief of the Clinical Microbiology Laboratory at Philadelphia General Hospital, also provided expert testimony for the defense. According to Dr. Heineman, even if a nurse did thrust a kleenex between appellee's wound and his bandage on the afternoon of November 4, 1963, this action could not have possibly caused appellee's clostridial cellulitis infection. Dr. Heineman emphasized that appellee's wound had been closed immediately after surgery and that a film of coagulated serum developing two to six hours later further sealed off the wound to outside sources of infection. Because clostridial cellulitis could not occur unless organisms were implanted deep into the tissue, Dr. Heineman surmised, without ascribing any fault to Dr. Chodoff, that the infection probably occurred in the operating room.[17] Finally, Dr. Heineman observed that temperatures do not go up or down gradually over a period of time; instead, temperatures "spike" or fluctuate rapidly. Thus, one could not assume that appellee's temperature gradually increased from 101.4 degrees at

16. When confronted with his original diagnosis, Dr. Mancall explained that he revised this diagnosis *after* he received the results of appellee's neurological tests and learned that appellee's brain disorder was more widespread than he imagined and *after* he learned about appellee's dramatically low blood pressure readings on the morning of November 6, 1963. According to Dr. Mancall, Wernicke-Korsakoff's Syndrome could not account for such a widespread brain disorder.

17. In his first report after his retention, Dr. Heineman stated that: "It is theoretically possible that kleenex tissues taken from an extremely dusty window sill . . . could have carried bacterial spores to the wound." At trial, Dr. Heineman asserted that this statement in no way contradicted his testimony; he emphasized that he wrote only "to the wound" rather than "into the wound."

4:00 p. m., on November 5, 1963, to 105.2 degrees at 8:00 a. m., the next morning.[18]

On June 6, 1975, after more than two weeks of trial and 1200 pages of testimony, the lower court submitted the case to the jury, and the jury returned a verdict in appellee's favor in the amount of $800,000. Appellant thereupon filed extensive written post-verdict motions and developed its arguments in a brief filed of record. After hearing oral argument, the lower court, sitting en banc, denied appellant's motions on July 27, 1976. This appeal followed.

## I

Appellant first contends that the lower court erred in submitting alternative theories of negligence to the jury. In its charge to the jury, the lower court submitted two alternative theories of negligence underpinning potential liability for the jury's consideration: (1) the negligence of the hospital nurse in allegedly stuffing a kleenex under the bandage covering the incision, thus allegedly causing appellee's clostridial cellulitis infection and leading to his subsequent fever and brain damage, and (2) even if the jury disbelieved the testimony concerning the alleged kleenex incident, the jury could still impose liability if the jury found that the hospital's agents [19] failed to render reasonable post-operative care and consequently caused the complained-of brain damage.[20]

18. Dr. Chodoff's testimony corroborated this depiction of temperature patterns, and no evidence in the record contradicted it.

19. No one disputes that the nurses and residents involved in this case acted as Jefferson's agents at all relevant times; thus, Jefferson may be held liable for their negligent acts. *Tonsic v. Wagner*, 458 Pa. 246, 329 A.2d 497 (1974); *McConnell v. Williams*, 361 Pa. 355, 65 A.2d 243 (1949).

20. Specifically, the relevant portion of the trial court's charge reads: "If, members of the jury, you are persuaded by a fair preponderance of this evidence, that the kleenex was used in the manner in which the plaintiff contends, then you may well find that the Jefferson Hospital was negligent. On the other hand, if you are not so persuaded, then, members of jury, you must consider whether reasonable care was exercised by the hospital rendering medical services in its post-operative care." Actually, appellant argues that the

Appellant concedes, as it must, that the jury could have properly premised a verdict in appellee's favor on the evidence and expert opinion testimony concerning the kleenex issue. However, appellant disputes the sufficiency of the evidence to support a verdict in appellee's favor on the alternative theory of negligence. Because the jury may well have discredited the kleenex testimony and may have based its verdict solely on the alternative theory of negligence, appellant contends that a new trial is warranted. *See, e. g., Hronis v. Wissinger*, 412 Pa. 434, 194 A.2d 885 (1963). Accordingly, in order to dispel doubt about the propriety of the jury's verdict in the instant case, we will analyze the sufficiency of the evidence to support the imposition of liability based on the hospital's allegedly negligent post-operative care.

trial court submitted *three* discrete theories of negligence to the jury: (1) negligence based on the alleged kleenex incident, (2) negligence based on the alleged failure of the hospital nurse to take appellee's temperature between 4:00 p. m., on November 5, and 8:00 a. m., on November 6, and (3) negligence based on resident Gosin's failure to perform surgery immediately at 10:45 a. m. when he first detected appellee's parlous condition. However, appellee's particularization of the above theories of negligence mischaracterizes the lower court's charge. At no point did the lower court charge that the jury could impose liability based solely on the nurse's alleged negligence in failing to take appellee's temperature during a 16 hour period or based solely on the resident's alleged negligence in failing to perform an operation at once. Instead, the lower court instructed the jury that it must assess the adequacy of the hospital's post-operative care over the entire time period between the November 4th surgery and Dr. Chodoff's life-saving performance on the afternoon of November 6th. Accordingly, we decline appellant's invitation to break appellee's case into three, rather than two, separated components for purposes of analysis.

We further note that the lower court at two later points in its charge instructed the jury that it could not find the hospital liable unless it found that the negligence of appellant's agents caused appellee's infection. However, appellee's attempt to prove that the agents' alleged negligence produced his infection depended entirely on the jury crediting the testimony of his mother-in-law and wife concerning the kleenex incident. Thus, the lower court's subsequent comments contradicted its earlier instruction that the jury could still find the hospital liable even if it rejected the testimony concerning the kleenex incident. Appellant did not object at trial that this ostensible contradiction confused the jury; indeed, any confusion caused could only have benefitted appellant.

A hospital may be liable for inadequate post-operative care if a plaintiff can prove that (1) hospital agents contravened the standard of care required of them in rendering post-operative care, and (2) this violation · of the appropriate standard of care proximately caused injury to the recuperating patient. *See, e. g.,* Restatement 2d of Torts § 323 (1965); *Tonsic v. Wagner, supra; Stack v.. Wapner,* 244 Pa.Super. 278, 368 A.2d 292 (1976); *Ragan v. Steen,* 229 Pa.Super. 515, 331 A.2d 724 (1974); *Hamil v. Bashline,* 224 Pa.Super. 407, 307 A.2d 57 (1973), allocatur denied, 224 Pa.Super. xxxvi (applying § 323 in a medical malpractice action); *Hamil v. Bashline,* 243 Pa.Super. 227, 364 A.2d 1366 (1976), allocatur granted, 243 Pa.Super. xxxvi (hereinafter *Hamil v. Bashline II* ). In determining whether appellee has adduced sufficient proof of these elements of his cause of action, we must accept as true all facts which support appellee's claim, and we must give appellee the benefit of all reasonable inferences arising from these facts. *Drew v. Laber,* 477 Pa. 297, 383 A.2d 941 (1978); *Collins v. Pennsylvania R. R.,* 358 Pa. 168, 56 A.2d 236 (1948).

In the case at bar, we have no trouble determining that a jury had sufficient evidence before it to find that hospital agents violated the appropriate standard of care and that this violation proximately caused appellee's extensive brain damage. In reaching this conclusion, we focus on the time period between 8:00 a. m., and sometime before 2:00 p. m., on November 6, 1963. In particular, we emphasize the failure of the hospital nurse and the hospital resident to take the action required by the appropriate standard of medical care to ameliorate appellee's critical condition.

At 8:00 a. m. on November 6, a nurse took appellee's temperature and recorded it at the precariously high level of 105.2 degrees. According to Dr. Chodoff, a nurse upon discovering such a high temperature had a duty to call immediately the resident or intern on duty; the resident or intern would then evaluate the patient's condition and decide whether to alert the attending physician. According to Margaret Summers, head medical surgery nurse at Jefferson

for 20 years, a nurse taking a temperature above 100 degrees and more than one degree higher than the range within which previous temperatures had run had a duty to notify the doctor at once. Here, the nurse recorded a 105 degree temperature at 8:00 a. m., yet appellee received no medical attention until the resident's examination at 10:45 a. m., 2¾ hours later. Thus, the hospital finds itself on the horns of an insoluble dilemma: either the nurse failed in the specified duty of care—immediate notification of an intern, resident, or doctor—or it took hospital personnel totally unexplained and extraordinarily long period of time to respond.

The hospital confronts a similar dilemma with respect to the testimony concerning the resident's examination of appellee at 10:45 a. m. Although the status of this resident is unclear, the record permits a finding that he violated the standard of care owed appellee. According to Dr. Chodoff, appellee's precarious situation was just as critical at 10:45 a. m., as it was when Dr. Chodoff arrived at appellee's hospital room between 1:00 p. m., and 2:00 p. m., that afternoon. If Dr. Chodoff had seen appellee at 10:45 a. m., he would have operated instantly. Moreover, Dr. Chodoff testified that sound medical practice would have dictated that either a surgeon or a senior resident operate immediately once he viewed appellee's condition at 10:45 a. m. Thus, if the examining resident enjoyed senior status, then he had a duty to operate on appellee without further delay. Dr. Chodoff also testified that if the resident examining appellee at 10:45 a. m. was not a senior resident and could not perform the indicated surgery, he had a duty to notify immediately either a senior resident or a surgeon who, in turn, would operate.

■ On the basis of the facts presented at trial, we know that the resident who examined appellee at 10:45 a. m. failed to operate immediately. Indeed, the record is silent as to exactly what steps—beyond the temporizing precaution of ordering a gram stain analysis—the resident took between 10:45 a. m., and 1:00 p. m. If the resident failed to notify

either a senior resident or the attending surgeon at 10:45 a. m., then he was negligent. If the resident did contact a doctor with the necessary skill and experience at 10:45 a. m., then once again the hospital is confronted with an inexplicable delay of at least 2¼ hours in providing the necessary medical treatment. Either way, hospital personnel violated the appropriate standard of care in rendering post-operative aid. In sum, between the hours of 8:00 a. m., and 1:00 p. m., on November 6, hospital personnel knew of appellee's extremely high temperature and critical medical condition, yet failed to provide the medical treatment necessary to alleviate the crisis.[21]

■■ Appellant also complains that appellee did not introduce sufficient evidence to demonstrate that appellee's failure to render adequate post-operative care proximately caused appellee's conceded serious brain damage. To the contrary, Dr. Mancall testified without equivocation that appellee's brain damage directly resulted from his exposure to high blood temperature and low blood pressure over a sustained period of time, and Dr. Ober testified that brain damage could occur in as little as two hours. Dr. Kool also unhesitatingly asserted that appellee's hyperthermia and low blood pressure on November 6, 1963, caused his brain

21. Given this analysis and conclusion, we need not determine whether appellee's testimony concerning the nurse's alleged failure to take his temperature between 4:00 p. m., on November 5, and 8:00 a. m., on November 6, would suffice, standing alone, to support a finding of liability against the hospital. We do note, however, that under *Stack v. Wapner, supra,* a jury could properly infer that absence of the mandated temperature entries in the hospital records meant that the temperatures were not in fact taken. Appellant argues that even if a nurse violated the duty to take appellee's temperature during the 16 hour period, there is no evidence, in light of the tendency of a person's temperature to "spike", that the nurse would have discovered an elevated temperature. Put another way, the very failure of appellant's agents to take and record a patient's temperature precludes that patient from proving causation. While we refrain from deciding whether a jury could impose liability solely on the basis of the 16 hour time gap and subsequent brain damage, we believe that the testimony concerning this period was supportive of a finding that the hospital rendered inadequate post-operative care over the period commencing after the November 4th operation and concluding with Dr. Chodoff's beside operation.

damage. Thus, the jury had sufficient evidence to conclude that the failure of hospital personnel to respond properly to appellee's known critical condition between 8:00 a. m., and 1:00 p. m., on November 6, acted as the causative agent in producing appellee's brain damage. Accordingly, we hold that the lower court did not err in submitting the issue of the hospital's alleged negligent post-operative care to the jury.[22] The jury could have properly found Jefferson Hospital liable on either of the two theories presented to it.

## II

Appellant's next general contention is that the lower court's charge misstated the law of proximate cause and burden of proof, distorted the evidence, and confused the jury. In a related contention, appellant asserts that the lower court's procedure in delivering the charge to the jury deprived appellant of its procedural due process rights and prevented it from making the timely and specific objection required to preserve the particular arguments now pressed on appeal. Because the latter contention of necessity determines our scope of review of appellee's particular objections to the charge, we will treat it first.

**22.** In *Hamil v. Bashline II, supra,* members of our Court expressed profound disagreement over the proper standard for determining when a plaintiff in a medical malpractice action has met his burden of proving proximate causation. Judge PRICE wrote the lead opinion, joined by two other judges, in which he argued that in order to prove proximate causation, plaintiff's expert must testify with certainty that the injury came from the asserted negligence. Judge HOFFMAN authored a Concurring Opinion in which he argued that a plaintiff would meet his burden of proof on proximate causation if an expert testified that the alleged deviation from accepted standards of medical practice constituted a substantial factor in the advent of the complained-of injury. Judge CERCONE filed a Dissenting Opinion, joined by Judge SPAETH, in which he also argued for a "substantial factor" test. In the instant case, plaintiff's experts testified with certainty that appellee's brain damage was caused by his exposure to high temperatures and low blood pressure over a sustained period of time on November 6, 1963. This testimony comported with the demanding standards of the lead opinion in *Hamil v. Bashline II, supra,* as well as the "substantial factor" test favored by the concurring and dissenting opinions.

Appellant contends that the trial court violated procedural due process when it employed the following procedure for entertaining objections to its charge. Prior to the charge, the lower court requested and received written points for charge from counsel; the court did not schedule oral argument on these proposed instructions nor did the court provide counsel with a written copy of its charge before delivering it to the jury. Because the court's charge was lengthy (30–45 minutes) and complex, appellant allegedly did not have an adequate opportunity to register meaningful, detailed complaints when the trial court finally entertained objections back in chambers after giving the charge.[23]

■■ We do not address the merits of appellant's procedural due process challenge because appellant has waived this argument. Appellant neither raised an objection to the trial court's procedure at trial nor included the issue in its written post-verdict motions or in its brief in support of these motions. Under the circumstances, appellant has waived it general attack on the procedural validity of the court's charge. *See Dilliplaine v. Lehigh Valley Trust Co.,* 457 Pa. 255, 322 A.2d 114 (1974) (hereinafter *Dilliplaine*); *Schneider v. Albert Einstein Medical Center,* 257 Pa.Super. 348, 390 A.2d 1271 (1978). Once we decide that appellant has waived its procedural attack on the court's charge, it ineluctably follows that appellant has waived any objection to the court's charge which it failed to raise in a specific and timely fashion below or in written points for charge.[24] *Dilli-*

**23.** It is significant to note that the jury did not retire for deliberations until *after* the court's session with counsel in chambers.

**24.** Included in this category of waived objections are allegations that: (1) the charge on appellee's burden of proof unfairly lumped all elements of his cause of action together instead of stating specifically that appellee bore the burden of proof on each issue, (2) the charge impermissibly allowed the jury to mix two separate theories of liability together and impose liability without finding proof of each element of that theory of negligence, (3) the court distorted Dr. Heineman's testimony and impugned his credibility, (4) the court failed to canvas defense testimony concerning appellee's alleged history of alcohol abuse, and (5) the court failed to comment on defense testimony that high temperatures could not cause brain

*plaine, supra; Campana v. Alpha Broadcasting Co., Inc.,* 239 Pa.Super. 39, 361 A.2d 708 (1976).

Appellant next contends that the lower court contravened the requirements of *Hamil v. Bashline II, supra* and *Gradel v. Inouye,* 252 Pa.Super. 392, 381 A.2d 975 (1977), when it charged the jury that proximate causation entails a finding that the hospital's negligence was ". . . a substantial factor in causing [appellee's] organic brain damage."[25] Appellant contends that the lower court should have charged the jury as follows: "In determining what is proximate cause, *the true rule is that the injury must be the natural and probable consequence of the negligence*—such a consequence as, under the surrounding circumstances of the case, might and ought to have been foreseen by the wrongdoer as likely to flow from his act." (quoting from *Guca v. Pittsburgh Railway Co.,* 367 Pa. 579, 586, 80 A.2d 779, 782 (1951)) (Emphasis supplied). However, for the reasons stated below, we find that appellant has waived this objection to the court's charge.

At trial, appellant submitted the following point for charge on the issue of proximate causation: "8 . . . The proximate cause of an event is that which, in a natural and continuous sequence, unbroken by any new, independent cause, produces the event, and without which the event would not have occurred. *The real test is not whether the injury was the natural and probable result of that negligence. . . .*" ("not" emphasized in original; our Court supplies the remaining emphasis.) After the lower court completed reading its charge, it asked counsel for their specific exceptions. When the court expressed its belief that the "substantial factor" charge covered the gist of appellant's point for charge no. 8, counsel responded only that the court had failed to emphasize sufficiently the concept of independent intervening cause. Counsel at no point object-

damage in light of the experience of malaria patients who had not developed this complication, despite sustained periods of high temperature.

**25.** *See* discussion of *Hamil v. Bashline II, supra,* note 22, *supra.*

ed to the court's use of the "substantial factor" test.[26] In sum, appellant not only failed to interject a specific and timely objection to the "substantial factor" charge, it explicitly rejected the very test of proximate causation—natural and probable consequence—it now endorses on appeal. *Dilliplaine, supra,* provides the correct response: appellant has waived this contention.[27]

Appellant further argues that the lower court erred in rejecting several of its properly submitted points for charge. We will briefly discuss and reject each of its arguments.

■ First, appellant maintains that the lower court erred in failing to read appellant's proposed charge on credibility. However, our review of the trial court's charge demonstrates that the court related the matter of credibility comprehensively and accurately; indeed, the court stressed the very factors—demeanor, interest, bias, means of observation, corroborating testimony, and surrounding circumstances—stressed by appellant in its point for charge.

■ Second, appellant argues that the trial court should have instructed the jury that an unexpected, unfortunate or even disastrous result is not, in and of itself, proof of negligence. While we agree with this proposition, *see Donaldson v. Maffuci,* 397 Pa. 548, 156 A.2d 835 (1959); *Ragan v. Steen, supra,* we do not believe that the omission of this charge in the instant case amounts to reversible error. The lower court's charge repeatedly emphasized that appellee had the burden of proving appellant's specific acts of negli-

**26.** Before us, appellant makes no attempt, other than his attack on the procedural validity of the charge, to explain his failure to object to the "substantial factor" portion of the charge in a timely and specific manner. Appellant has also dropped its contention, raised at trial, that the lower court's charge unfairly slighted the concept of independent intervening cause.

**27.** In an almost identical contention, appellant argues that the lower court erred in failing to instruct the jury that when two or more possible causes exist for an injury, the plaintiff must prove that the injury was the result of the particular cause involving the defendant's alleged negligence. At the post-charge conference, counsel expressly informed the court that the court's charge had satisfactorily covered this particular point.

gence caused appellee's brain damage; implicit in these instructions is the converse proposition that a finding of negligence cannot be grounded upon the ultimate result of brain damage alone.

Third, appellant challenges the lower court's alleged refusal to specify the different standards of care which nurses, doctors, and residents must observe. Insofar as appellant argues that the lower court failed to specify the standard of care applicable to a resident, appellant waived this contention by failing to incorporate the purported distinction in a point for charge or to object to the wording of the court's charge after its delivery. *See Dilliplaine, supra.* Insofar as appellant claims that the lower court failed to particularize the appropriate standards of care for nurses and doctors, we disagree with appellant on the merits. The court specifically charged the jury that a nurse has a duty to follow a doctor's instructions, including the taking and recording of vital signs and reporting of a rise in temperature. Under the facts of this case, this articulation of a nurse's duty is the appropriate standard of care against which to measure a nurse's allegedly negligent conduct. We also note that appellant raises no objection to that portion of the charge stating the appropriate standard of care for a doctor.

Fourth, appellant asserts that the lower court erred in failing to charge the jury that if it believed that appellee's injuries stemmed from causes beyond appellant's control, then it should enter a verdict in appellant's favor. This proposed charge also would have admonished the jury not to speculate or conjecture as to the precise cause of appellee's injuries. Again, we believe that the lower court's charge adequately covered the substance of this proposed instruction when it stated appellee's burden of proof on the causation issue. Appellant's proffered charge would have accomplished no more than to recast the court's charge on burden of proof into its converse proposition: if the jury affirmatively finds that the hospital's negligence did not cause

appellee's injuries, then the jury must find for appellant.[28] Regardless of whether the omission of this charge is objectionable, it is certainly not reversible error.

Finally, according to appellant, the lower court should have charged the jury that it should not find in plaintiff's favor if it determines that plaintiff suffered from an unfortunate condition in existence prior to his treatment at Jefferson. No discernible evidence in the instant case suggests that appellee suffered from organic brain damage prior to the 1963 operation; the requested point for charge would have only confused, not aided, the jury. Moreover, the lower court thoroughly and repeatedly instructed the jury that appellee had the burden of proving that appellant's negligence during the 1963 hospitalization caused appellee's subsequent brain damage. There is no merit to this last contention.

We have now reviewed all of appellant's attacks on the trial court's charge and found them wanting. We turn next to appellant's equally pervasive, but ultimately futile challenge to the lower court's evidentiary rulings.

### III

Appellant next presents a number of contentions which allegedly demonstrate that the lower court effectively thwarted the presentation of its primary defense. More specifically, appellant contends that the lower court defeated its attempt to prove that appellant suffered from Wernicke-Korsakoff's Syndrome—a brain disease caused by excessive use of alcohol—through a series of erroneous and prejudicial evidentiary rulings and through overt manifestations of hostility towards defense counsel and a defense witness. At the outset, we state our belief that the record reveals that the trial court acted fairly and evenhandedly throughout the more than two weeks of trial. With this observation firmly

---

**28.** Appellant's counsel recognized as much at the post-charge conference in the trial court's chambers. At this time, counsel stated that his only objection was to the court's failure to caution against speculation.

in mind, we now turn to an examination of each one of appellant's numerous evidentiary objections.

Appellant first directs our attention to the lower court's purported failure to allow Dr. Slap, appellant's chief witness on the nature and consequences of Wernicke-Korsakoff's Syndrome, to testify that he disagreed with the conclusions of Dr. Mancall, appellee's main proponent of the hyperthermia and low blood pressure theory of causation. Putting this contention into its specific context, we note that the alleged error occurred when appellant's counsel asked Dr. Slap whether he agreed with the conclusions Dr. Mancall had expressed in an article entitled "Some Unusual Neurological Diseases Complicating Chronic Alcoholism." The lower court sustained an objection because appellant's counsel had not cross-examined Dr. Mancall on the basis of this article when Dr. Mancall was on the stand; thus, Dr. Mancall never had an opportunity to explain his conclusions or to clarify any discrepancies between his written conclusions and his trial testimony. According to appellant, the lower court's ruling impermissibly deprived it of an opportunity to impeach and contradict the fundamental basis of appellee's case: Dr. Mancall's expert conclusions. We disagree.

*McCormick on Evidence*, § 37 at p. 72 (McCleary Ed. 1972) states the general rule proscribing the impeachment of a witness by a prior inconsistent statement without affording the declarant an opportunity on cross-examination to deny or explain the statement:

"In 1820 in the answers of the judges in *Queen Caroline's Case*, it was announced: 'If it be intended to bring the credit of a witness into question by proof of anything he may have said or declared touching the cause, the witness is first asked, upon cross-examination, whether or not he has said or declared that which is intended to be proved.' [2 Brod. & Bing. 284, 313, 129 Eng.Rep. 976 (1820)]. Thus was crystallized a practice which was previously occasional and discretionary. Only later and gradually was it almost universally accepted in this country. The purposes of the requirement are (1) to avoid unfair surprise to the adversary, (2) to save

time, as an admission by the witness may make the extrinsic proof unnecessary, and (3) to give the witness, in fairness to him, a chance to explain the discrepancy." (footnotes omitted). *See also* 3A *Wigmore on Evidence* §§ 1025–39 (Chadbourn rev.). While Pennslyvania courts once applied this rule in an inflexible manner, *see, e. g., Marshall v. Carr,* 275 Pa. 86, 118 A. 621 (1922), recent cases have emphasized the trial court's discretion to allow impeachment on the basis of a prior inconsistent statement without requiring the laying of a foundation on cross-examination. *See Commonwealth v. Dennison,* 441 Pa. 334, 272 A.2d 180 (1971); *Commonwealth v. Robinson,* 229 Pa.Super. 131, 324 A.2d 441 (1974).[29]

In the instant case, we perceive no abuse of discretion in the lower court's ruling. This case involved complicated, indeed esoteric, questions of medical science; it would be grossly unfair to allow one expert witness—Dr. Slap—to summarize and criticize the conclusions of another expert witness—Dr. Mancall—without first affording the latter an opportunity to place his article's conclusions into context or to explain why the article's conclusions do not necessarily apply to the facts at hand.[30] The lower court acted well within the boundaries of its discretion when it refused to allow the projected line of questioning. *See Steffy v. Carson,* 422 Pa. 548, 222 A.2d 894 (1966).[31]

**29.** Appellant cites only one case in support of its argument: *Logue v. Potts Mfg. Co.,* 381 Pa. 144, 146, 112 A.2d 370, 371 (1955) in which the Supreme Court stated: "When counsel agrees to excuse a witness and the witness retires, no rule of law exists, or should be promulgated, whereby the other side is foreclosed from producing testimony which may contradict prior testimony. Unless counsel is willing to assume this risk the witness should be required to remain in court and not be discharged." *Logue,* however, is inapposite because it did not involve a prior inconsistent statement by the excused witness; it involved only contradiction by independent evidence. In such a case, a witness need not be allowed an opportunity to rebut such evidence.

**30.** Appellant made no effort to recall Dr. Mancall for the purpose of laying the proper foundation.

**31.** Even were we to conclude that the lower court abused its discretion on this point, we doubt that the alleged error was sufficiently prejudicial to mandate reversal. First, appellant's counsel never

The court's refusal to allow Dr. Slap to express his disagreement with the conclusions reached in Dr. Mancall's article spawned another problem. After sustaining the objection, the court asked defense counsel if Dr. Slap was qualified as an expert on the subject of alcoholism and suggested that if he was, Dr. Slap should testify as to his own conclusions rather than those of Dr. Mancall. Upon receiving counsel's assurances that Dr. Slap was a qualified expert on alcoholism, the court further wondered whether sufficient evidence of chronic alcoholism had been presented so that an expert could properly express his opinion about the effect of such a problem on appellee's brain disease. Appellant now alleges that by speculating on the sufficiency of the evidence to support a finding of chronic alcoholism at that time in the trial, the lower court vitiated its primary defense. However, appellant has waived this contention by failing to object to the court's comments at trial. If counsel found the court's observations objectionable and potentially damaging, he should have immediately requested a sidebar conference for the purpose of informing the court of his objection and giving the court an opportunity to cure any error it might have made. Here, appellant's counsel entered no objection to the court's comments whatsoever; his only statement after the court finished its observations was: "Thank you, your Honor." Furthermore, the lower court's observations had no consequential impact on Dr. Slap's testimony. He proceeded to outline his theory of how Wernicke-Korsakoff's Syndrome caused appellee's brain damage, and he stressed appellee's history of drinking problems as the basis of his conclusions.[32]

informed either the lower court or our Court of how he intended to use Dr. Mancall's article. Thus, we can only conjecture how the collateral attack on Dr. Mancall's article might have undermined Dr. Mancall's trial testimony. Second, the lower court allowed Dr. Slap to ventilate quite fully his emphatic disagreement with Dr. Mancall's conclusions and to develop his thesis that Wernicke-Korsakoff's Syndrome and excessive use of alcohol caused appellee's present maladies.

32. In a related contention, appellant contends that the following interchange between court and counsel contained prejudicial error:

 Appellant next argues that the lower court imper-missibly restricted cross-examination of Dr. Mancall on the basis of a treatise, *Harrison's Principles of Internal Medicine*, which the doctor conceded to be a well-known, highly authoritative work. The following interchange occurred when counsel attempted to pursue his cross-examination: [33]

"Q. [1] Is there anything in here that you don't agree with in this book of principles of internal medicine?

"MR. LEVANT [Appellee's counsel]: Objection, Your Honor.

"THE COURT: Sustained.

"Q. Doctor, if in this book that I just mentioned, they list under 'cerebral atrophy' one of the causes as alcoholism or alcohol, would you agree with that?

"A. I think in terms of cerebral cortical atrophy, yes, alcohol is among the causes.

"Q. [2] Now, if, Doctor, in the index under 'cerebral atrophy,' there are other entries in this book and hyperthermia does not appear as one of these entries, would you agree with that?

"MR. LEVANT: Objection, Your Honor.

"THE COURT: Sustained.

"In your experience in treating alcoholics would you tell me whether these alcoholics that you have treated almost invariably understate the amount that they drink?
"THE COURT: Gentlemen—
"MR. LEVANT: Objection.
"THE COURT: I don't see what alcoholics have to do with this. We have not established that anybody in this case was an alcoholic.
"MR. ROSSITER: I withdraw the questions, Your Honor." First, we note that the lower court quite properly sustained an objection to such a highly irrelevant question; appellant's counsel conceded as much when he withdrew the question. Second, insofar as appellant argues that the court's interjection constituted impermissible speculation and usurpation of the jury's province, we note once more that counsel failed to enter any objection below and thus denied the lower court an opportunity to cure any prejudice it may have caused. *Dilliplaine, supra.*

33. We will number the questions which the trial court disallowed for purposes of easy reference in our discussion of each trial court ruling.

"BY MR. ROSSITER [Appellant's counsel]:

"Q. Doctor, would you take this book and look at the index for me.

"A. (The witness complies.)

"Q. Do you have the index open, Doctor?

"A. I have it open, yes.

"Q. [3] What is the first entry under 'cerebral atrophy'?

"MR. LEVANT: Objection.

"THE COURT: Sustained.

"Q. [4] Doctor, is hyperthermia listed in the index as a cause for cerebral atrophy?

"MR. LEVANT: Objection.

"THE COURT: Sustained.

"Q. [5] Doctor, if you were confronted with any authoritative book wherein there was information that reports of cerebral atrophy and large ventricles tends to confirm or at least is consistent with Korsakoff's psychosis, would you agree with that?

"MR. LEVANT: Objection.

"THE COURT: Sustained."

Questions one and five are so patently overbroad as to be meaningless; in question one, counsel neglected his obligation to narrow his question to a specific portion or passage of the text while in question five, counsel failed to specify any book at all. Question two is in fact a non-question and does not deserve a response. Questions three and four attempt to establish that the text's index omitted mention of hyperthermia under the heading "cerebral atrophy"; according to appellant, this omission signifies the author's belief that hyperthermia could not have caused appellee's cerebral atrophy.[34] At best, the inference which appellant seeks to draw from the absence of an entry in the index is tenuous and strained; even assuming the relevance of this line of

34. Appellant concedes that the body of the text does not expressly repudiate hyperthermia as a cause of cerebral atrophy.

questioning, we believe that the lower court's decision to terminate it had at most a negligible impact on appellant's defense.

 Appellant next contends that the trial court erred in preventing Dr. Heineman, a defense expert, from answering the following question on direct examination:

"Q. Dr. Mancall, in his report, *seemed* to, if I read it correctly—I don't have it in front of me here—*seemed* to believe that the combination of high—or excuse me, the low blood pressure which the chart reflects and the fever which the temperature chart and the progress note reflects, *seem* to have a bearing on the hyperthermic episode, and it's combination with the hypotensive episode, *seemed* to have a bearing on the case, in that this in effect caused death of brain cells.

"Do you agree with his analysis?

"MR. LEVANT: Objection.

"THE COURT: Sustained."

(emphasis supplied).

This question unfairly mischaracterizes Dr. Mancall's testimony; by constant repetition of the word "seemed", counsel imputed a lack of certainty to Dr. Mancall's testimony which it did not contain. The lower court properly sustained appellee's objection.[35]

 We now examine two allegations that the lower court manifested hostility towards the defense when it reprimanded without justification defense counsel and a defense witness. The first incident of alleged hostility arose when appellant's counsel attempted to cross-examine Dr. Mancall

**35.** Two other observations on this question are not amiss. First, appellant's counsel continued to question Dr. Heineman about the connection between high temperatures and brain damage, and Dr. Heineman expressed his opinion that high temperatures alone could not cause brain damage. Second, Dr. Heineman was an infectious disease expert who primarily testified as to the source of the infection; his opinion outside of his area of special expertise would not carry as much weight as his opinion concerning appellee's case of colstridial cellulitis.

on the basis of a letter written by another doctor. When counsel asked Dr. Mancall to read the last two paragraphs of this letter, the lower court properly sustained the objection of appellee's counsel because the other doctor had not testified nor had his records been introduced into evidence.[36] Appellant's counsel then asked if Dr. Mancall ". . . was aware that Dr. Wood in 1970 wrote. . . ."; the lower court properly sustained an immediate objection to this effort to read Dr. Wood's letter. In sustaining the objection, the lower court administered the following rebuke: "Mr. Rossiter [appellant's counsel], if the Court sustains an objection, it does not mean that you ask the same question in another way. It means it is not admissible. Now, you can get that record in if you want to and if you know how to get it in properly; but you don't get it in this way." We find no fault with this mild admonishment; it perfectly fit the situation created by the disingenuous attempt of appellant's counsel to evade the spirit of the trial court's ruling.

The second incident of alleged intemperance occurred when the trial court sustained an objection to a rambling response by a defense witness, Dr. Slap.[37] The following interchange occurred:

"MR. LEVANT: Objection, Your Honor.

"THE COURT: Sustained.

"THE WITNESS: Your Honor, could you explain to me—

"THE COURT: I don't have to explain anything to you in this court. I'm running this court, not you.

"MR. ROSSITER: Doctor, please."

The record, of course, does not indicate the tone of the comments made by either Dr. Slap or the trial judge. However, it is relevant to note that appellant's counsel believed that his witness, rather than the trial judge, needed restraint. Moreover, the absence of an objection by counsel to

36. Appellant does not argue before us that the lower court committed prejudicial error in sustaining this objection.

37. Appellant does not now contend that the court committed prejudicial error in sustaining this objection.

the court's statement not only confirms this impression, it constitutes a waiver of this particular objection. *See Dilliplaine, supra.* In any case, we cannot say on the basis of this record that the trial court's rebuke exceeded the bounds of propriety.

■■■ Our review and rejection of each specific evidentiary objection raised by appellant reinforce our impression that the lower court conducted this complicated and protracted trial in an impartial and fair manner and did not deprive appellant of a meaningful opportunity to present its defense based on Wernicke-Korsakoff's Syndrome. In fact, appellant introduced extensive expert testimony on how appellee's alleged past drinking problems caused his present plight. Having rejected appellant's contentions concerning particular evidentiary rulings, we now turn to appellant's last contention: the alleged excessiveness of the jury verdict.

## IV

Appellant finally contends that it should be awarded a new trial because the jury verdict of $800,000 in appellee's favor was excessive.[38] In *Skoda v. West Penn Power Co.,* 411 Pa. 323, 338, 191 A.2d 822, 830 (1963), our Supreme Court formulated the proper test for determining whether a jury verdict is excessive:

■■■ "Appellate courts are properly reluctant to interfere with jury verdicts in personal injury cases, which verdicts are supported by the opinion and approval of the trial judge and the court en banc. *Roadman v. Bellone,* 379 Pa. 483, 108 A.2d 754 (1954). The granting or refusal of a new trial because of excessiveness is peculiarly within the discretion of the court below and we will not interfere, absent a clear abuse of discretion. *Hall v. George,* 403 Pa. 563, 170 A.2d 367 (1961). We will not hold that a verdict is excessive unless it is ' "so grossly excessive as to shock our sense of

38. In the alternative, appellant asks for a remittitur in the amount of $200,000.

justice." ' *Kane v. Scranton Transit Co.,* 372 Pa. 496, 94 A.2d 560 (1953), and cases cited therein." *See also Dichiacchio v. Rockcraft Stone Products Co.,* 424 Pa. 77, 225 A.2d 913 (1967); *Weed v. Kerr,* 416 Pa. 233, 205 A.2d 858 (1965); *Lupi v. Keenan,* 396 Pa. 6, 151 A.2d 447 (1959). In *Kemp v. Philadelphia Transportation Co.,* 239 Pa.Super. 379, 361 A.2d 362 (1976), our Court noted that while each case is unique and dependent upon its own special circumstances, the following factors, *inter alia,* are relevant in determining whether a particular verdict is excessive: (1) the severity of the injury, (2) whether plaintiff's injury is manifested by objective physical evidence instead of merely the subjective testimony of the plaintiff, (3) whether the injury will affect the plaintiff permanently, (4) whether the plaintiff can continue with his employment, (5) the size of plaintiff's out-of-pocket expenses, and (6) the amount plaintiff demanded in the original complaint.[39]

In the instant case, the lower court instructed the jury it could consider several items in determining the proper amount of damages: (1) appellee's past loss of earnings and earning capacity, (2) appellee's future loss of earnings and earning capacity, (3) appellee's past medical expenses, (4) appellee's future medical expenses, (5) appellee's past pain and suffering, (6) appellee's future pain and suffering, and (7) appellee's loss of enjoyment of life.[40] Appellant accepts these guidelines but argues that, with the exception of items

**39.** The record does not contain the original complaint. In any event, the amount of damages claimed in the 1965 complaint would be of limited relevance to our inquiry since the substantial bulk of appellee's alleged damages accrued after the filing of the complaint. As to the other factors suggested in *Kemp v. Philadelphia Transp. Co., supra,* our detailed discussion *infra* will show that appellee has satisfied each test.

**40.** Appellant now contends that the lower court erred in failing to instruct the jury that in assessing appellee's loss of enjoyment of life, it should not consider appellee's pain and suffering. Appellee fears the spectre of double recovery. However, appellant neither filed a point for charge raising this specific problem nor excepted to the lower court's charge. Accordingly, he was waived this contention. *Dilliplaine, supra.*

(3) and (4), the jury overvalued appellee's proven damages in each instance. We will examine appellant's arguments *seriatim*.

In connection with items (1) and (2), appellant contends that appellee failed to adduce definitive medical testimony connecting the hospital's negligence in 1963 to appellee's subsequent inability to continue gainful employment. In particular, appellant emphasized that appellee "voluntarily quit" his job at Gulf Oil Company in 1965, and that no evidence supported the existence of appellee's brain damage and psychiatric problems at that time. However, Dr. Kool, psychiatrist, testified that appellee sustained his brain damage as a result of his experience at Jefferson Hospital in 1963. After his discharge, appellee began to show personality changes, and his mental condition began to regress. By 1965, appellee, as a result of his brain damage, had become acutely psychotic and delusional; this mental instability caused appellee to quit work in June, 1965, and precluded his gainful employment thereafter. To buttress Dr. Kool's testimony, appellee presented the testimony of the Director of Personnel Administration of the Gulf Oil Company refinery in Philadelphia. He testified that on the day appellee terminated his employment, he was quite unstable and extremely anxious, and his actions had no apparent rational basis, especially in light of his forfeiture of all accrued pension benefits. Moreover, the plant physician who examined appellee in 1965 testified that he diagnosed appellee as psychoneurotic shortly before he terminated his employment, and that the report of a Veterans Administration Hospital psychiatrist had confirmed his impression. Finally, appellee's wife testified that her husband's constant delusions and fragile nervous condition prevented him from performing two part-time jobs with employment agencies in 1971 and 1972. Given the above testimony, we find ample evidence that appellee's brain damage had manifested itself by 1965 and that it caused appellee's inability to continued employ-

ment at Gulf Oil and to pursue alternative employment thereafter.[41]

Once we conclude that appellee is entitled to lost wages dating back to 1965, then the parties agree that he lost a little more than $100,000 in compensation between 1965 and the start of the trial.[42] In addition, appellee established that if his brain disease had not prohibited gainful employment in the future, he would have earned about $78,000 between the date of trial and his 65th birthday.[43] Moreover, the parties agree that appellee's past medical expenses total $8,500 and that his future medical expenses, including continuous psychiatric consultation and medical sedation, will amount to at least $2,000 per year over a remaining life expectancy of 18.2 years from the date of trial. Thus, appellee's past and future medical compensation total roughly $45,000. In sum, appellee has presented competent evidence to show that he has sustained tangible damages of at least $225,000 in lost past and future wage compensation and past and future medical payments. We must now determine whether an award of approximately $575,000 is excessive remuneration for the final three items mentioned

**41.** In an affidavit attached to his brief, appellant's counsel alleges that shortly after the trial, a person who worked with appellee at an employment agency in 1972 informed counsel that appellee had suffered two head injuries during his employment. After these injuries, appellee's mental condition allegedly began to deteriorate rapidly. Appellant now asks that we take into account these unproven allegations in assessing the purported excessiveness of the jury verdict. This we refuse to do; these allegations are not a part of the record and are therefore outside the bounds of appropriate appellate review. *Commonwealth ex rel. Valentine v. Strongel,* 246 Pa.Super. 466, 371 A.2d 931 (1977). If appellant wishes to pursue these allegations, his remedy is to file a motion for a new trial on the basis of after-discovered evidence.

**42.** This figure assumes a 40 hour working week at the base pay rate for a number one pumper; it does not take into consideration such factors as overtime and shift differential.

**43.** Appellee also claims that he is entitled to recover for lost pension benefits which would have vested in 1968 had appellee's brain damage not caused the premature severance of his connection with the Gulf Oil refinery. However, appellee does not attach a specific figure to this asserted loss.

by the trial court: past pain and suffering, future pain and suffering, and loss of enjoyment of life.

In determining whether appellee received excessive compensation for past and future pain and suffering and loss of enjoyment of life, we begin with the observation that ". . . in any effort to translate such catastrophic human loss . . . into money damages . . ., systematic logic is not helpful and precision is not achievable." *Frankel v. Heym,* 466 F.2d 1226 (3rd Cir. 1972).[44] Here, appellee has demonstrated that hallucinations besieged his mind during his recuperation after Dr. Chodoff's emergency operation. He has proven that his brain damage is irreversible and that his severe psychiatric problems will frustrate his future just as they have plagued his past. From an outgoing, sociable man, appellee has been transformed into a person unable to cope with life and reduced to such neurotic activity as nailing his apartment windows shut, locking his wife out of the apartment, and arming himself with Japanese World War II souvenirs in order to protect himself against imagined invaders. In sum, because appellee has suffered the most wrenching psychiatric experiences and because he has no prospect for improvement or enjoyment of life in his very bleak future, we cannot say that the jury verdict shocks our collective sense of justice. *Skoda v. West Penn Power Co., supra.* Accordingly, we reject appellant's invitation to substitute our estimation of an appropriate award for that reached by twelve reasonable jurors and confirmed by the trial court and the court en banc. Having completed our review of appellant's numerous contentions and having found no meritorious claims, we affirm the lower court's order denying appellant's post-verdict motions.

Order affirmed.

44. In *Frankel, supra,* a Third Circuit panel, applying Pennsylvania law, upheld a $650,000 award for loss of enjoyment of life, pain and suffering, inconvenience, disfigurement, and permanent injuries, when, as a result of a car crash, the plaintiff sustained brain damage which made her psychotic and left her with the mentality of a five year old child.

CERCONE, J., concurs in the result.

PRICE, J., files a concurring opinion.

HOFFMAN, J., did not participate in the consideration or decision of this case.

PRICE, Judge, concurring:

I join the majority opinion in all of its conclusions, but file this opinion only to express my conviction that the charge of the court below contravened the requirements of *Hamil v. Bashline* (*Bashline II*), 243 Pa.Super. 227, 364 A.2d 1366 (1976) and *Gradel v. Inouye,* 252 Pa.Super. 392, 381 A.2d 975 (1977) when it charged the jury that proximate causation entails a finding that the appellant's negligence was ". . . a substantial factor . . ." in causing appellee's damage. Further I wish to state that I do not agree in toto with the comments contained in footnote 22 (Slip Opinion P. 18) of the majority opinion as they relate to the expert testimony of appellee's witnesses.

I do, however, agree that appellant has waived the argument.

I join in affirming the judgment.