## Woodland, Appellant, *v.* Philadelphia Transportation Company.

Argued November 30, 1967. Before Musmanno, Jones, Eagen, O'Brien and Roberts, JJ.

reargument refused March 11, 1968.

*Edward Leach,* with him *Hy Mayerson* and *Louis Kassarich,* for appellant.

*James Conwell Welsh,* for appellee.

Opinion by Mr. Justice Musmanno, January 9, 1968:

Viola C. Woodland, administratrix of the Estate of Edward W. Helm, sued in trespass the Philadelphia Transportation Company to recover damages for the death of Edward Helm, resulting from a collision between the automobile which he was driving and a bus belonging to the defendant company.

At the trial the Coroner (now known as Medical Examiner) of Philadelphia County was called by the plaintiff to prove the cause of death. He testified that that cause was "crushing comminuted fractures of the skull, contusions and lacerations of the brain, a number of other fractures, contusions and lacerations of the spinal cord and of the lungs, as well as a number of other injuries."

The trial court then asked: "These would have caused death in all probability or weren't you able to

say?" The witness replied: "that when there are multiple injuries of this type . . . together with other factors sufficient to cause death, I do not specify specifically one thing."

The only purpose for the appearance of the Coroner, so far as the plaintiff's case was concerned, was to show that the traffic victim had died of injuries and not of old age, illness or some other non-traumatic infirmity. In one of those rare moments of heedlessness which perhaps sometimes assails the best of attorneys, plaintiff's counsel asked what were the other factors, whereupon the Coroner volunteered: "the other factors, together with the alcoholism would have been sufficient to cause death."

The question was unwisely put and the answer was improperly given because, obviously, crushing comminuted fractures of the skull, plus lacerations of the brain and the spinal cord, would have been enough to kill a Samson. Indeed, the Coroner's Death Certificate declared that Helm came to his death because of "multiple injuries." The trial judge also stated that "these would have caused death in all probability."

But this contretemps at the very threshold of the trial was to lead down the corridor of improprieties to more serious irregularities in trial procedure. Taking up the cross-examination of the Coroner, defendant's counsel proceeded to conduct a seminar on the subject of alcoholics and alcoholism, although, as already stated, the death certificate made no mention of alcohol in any way. He asked the witness about his answer on alcoholism and the witness replied: "A. My statement was that the conclusion as to the death was multiple injuries and that I did not specify that the injuries to the skull and the brain were the cause of death because other injuries in conjunction with alcoholism could, in and of themselves, have produced death. Q. Did you have a series of standard blood

tests made by your department as to the blood in the stomach and the brain for alcohol. A. Yes . . . A. I do not know what you mean by taking tests. Q. Who determined the alcoholic content, what department? A. I will explain it this way, by saying that specimens of tissue were removed and retained by me. Analyses were performed by our toxicology department which is under my direct supervision as Director of Laboratories and that report was submitted to me, and that interpretation of such reports was done by me. By Mr. Welch: Q. What did your department, under your direction and control, find as a result of these tests? Mr. Schaffer: I would still like to note my objection on the record. The Court: It is overruled. The Witness: The records indicate that the blood contained 0.15 grams per cent of ethyl alcohol, the brain contained 0.14 grams percent of ethyl alcohol, and the urine contained 0.27 grams per cent of ethyl alcohol, that is 0.15 or 150 milligrams contained in the blood. By Mr. Welch: Q. Do you know of any standard in the country or in the various health departments by which it is determined that an individual can or cannot drive an automobile with a certain percentage of alcohol, and if so, what is the name of that standard? A. I know of no standard that states an individual cannot drive an automobile in this country. Q. Do you have any knowledge of any standard wherein it is considered not safe to drive an automobile with a certain percentage of alcohol as in this case? Mr. Schaffer: I object to that question, Your Honor. The Court: The objection is overruled. By Mr. Welsh: A. Is that the American Standard? I am searching for the proper tables or means. A. There are various laws which vary. There is a standard which has been approved and accepted by the American Medical Association and by the National Safety Council. Q. What standard, using either or both of these, and, if there is a differ-

ence give it to us, what is the standards, say of the American Medical Group. A. The standard of both is that individuals, when the blood level is 0.10 grams per cent, or 100 milligrams percent of ethyl alcohol, are sufficiently under the influence of alcohol as to render them unsuitable to operate a motor vehicle."

This type of so-called cross-examination went on further. It must be apparent that the Coroner had come prepared to testify in behalf of the defendant's proposition that the decedent's death was due to excessive drinking, but, instead of presenting his testimony as a defendant's witness, he was able, through the ingenuity of defendant's counsel and the laxity of the trial court, to propel the defendant's cause through the goal posts under the guise of a plaintiff witness answering questions on cross-examination.

But the improprieties did not cease here. After the Coroner had fired the ammunition of the defendant's case behind the armor-plate protection of alleged cross-examination, plaintiff's counsel attempted to repair the breach made in the walls of his case by counter-attacking with questions intended to shake the reliability of the witness's testimony introduced through a sly flank movement.

But here, the trial judge, exceedingly lenient in permitting the improper cross-examination, tightened up on the rules, and refused plaintiff's counsel the opportunity to ask the witness questions on matters which had been brought out in the cross-examination. Plaintiff's counsel asked the witness: "Isn't it possible that drinking alcohol would not interfere with a person's driving ability?" The trial court sustained defendant's objection to this question. The court later explained, in support of its ruling, that the witness "was not called as an expert, but as a factual witness to testify as to what was in the records."

The quotations in this opinion taken from the Coroner's testimony indicate quite clearly that, when answering the extended cross-examination of defendant's counsel, he was testifying as an expert witness and not as a factual witness. The factuality drawn out by plaintiff's counsel had to do only with the cause of death. There was nothing in the fragmentary questioning by plaintiff's counsel which, by the widest stretching of language, could allow the witness to discuss blood tests for determining intoxication at an automobile wheel.

The jury returned a verdict for the defendant, and the plaintiff asked for a new trial because of what has just been narrated. In refusing the motion for a new trial, the trial court said that the plaintiff had "called a forensic pathologist employed by the Medical Examiner, Department of Health, City of Philadelphia, to testify at the trial." But this witness had not been called by the plaintiff to testify on pathology. In effect he was called only to read the death certificate which he had prepared.

In defending the extended cross-examination by defendant's counsel, the court said that as an expert witness the Coroner was subject to wide cross-examination. Yet, after making the Coroner an expert for the defendant's cross-examination, the court characterized him a factual witness when plaintiff's counsel wished to quiz him on the very subject on which he had expatiated under the defendant's cross-examination.

The lower court erred in its rulings as above indicated. This Court has stated repeatedly, as the trial court admitted in its opinion denying a new trial: "Unless the witness is himself one of the litigants . . . cross-examination should be confined to the matters upon which he was examined in chief."

Concededly, trials today are not contests in technical skill. The day when a just claim was defeated be-

cause of a formalistic peccadillo is happily gone, but still, there must be rules for the conducting of a fair trial. Nothing can be fairer than American sportsmanship, yet in athletic contests, whether baseball, football, basketball or hockey, there are certain things a player may not do simply because they are not conducive to a wholesome and honest determination of the game.

Thus, when a litigant is compelled, because of the exigencies of the trial, to call to the witness stand a witness who is obviously hostile to him, the witness should not, while under the assumed flag of neutrality, pour shot into his helpless sponsor.

In the case of *Tolomeo v. Harmony*, 349 Pa. 420, the plaintiffs sued a bus company for injuries inflicted on them through the averred negligence of the bus driver. The defendant bus company denied agency of the driver, and the plaintiffs called the driver of the bus for the sole purpose of establishing agency. After the driver's brief testimony on this narrow issue, defendant's counsel proceeded to cross-examine him all over the lot on the manner in which the accident happened. Then, when plaintiff's counsel attempted to examine the witness on the matters brought out by him under the so-called cross-examination, the court restrained the further examination. In declaring the need for a new trial on the facts as here related, Chief Justice STERN, speaking for a unanimous court, said in a scholarly opinion: "It is elementary that, unless the witness is himself one of the litigants (Greenfield v. Philadelphia, 282 Pa. 344, 127 A. 768), cross-examination of his testimony should be confined to the matters upon which he was examined in chief. This has been the rule in Pennsylvania since it was proclaimed by Chief Justice GIBSON in 1827 in Ellmaker v. Buckley, 16 S. & R. 71, 77, 78, and it has been consistently adhered to ever since; there was no intention to impair it, as a general principle, by anything that was said in the

course of the court's opinion in Conley v. Mervis, 324 Pa. 577, 188 A. 350. It is true that considerable latitude must be left to the trial judge, and his action will not be reversed in the absence of an abuse of discretion or unless obvious disadvantage resulted therefrom to the other party. But in the present case it is obvious both that discretion was abused and that harm did result to plaintiffs. By denying the agency of the operator of the bus defendant made it necessary for plaintiffs to call him, an essentially hostile witness, out of the camp of the enemy in order to question him as to his employment; certainly defendant should not have been allowed to take advantage of the situation which it thus created by attempting to make the operator's version of the accident appear as though it came from a witness selected by plaintiffs themselves. This was an extension of the right of cross-examination without parallel in any reported case and particularly objectionable because the testimony elicited on cross-examination went to the very heart of the controversy. That plaintiffs suffered injury thereby is too plain for argument; the witness's testimony was educed by a most flagrant series of leading questions, while, on the other hand, the right of cross-examination—stated by Wigmore to be 'the greatest legal engine ever invented for the discovery of truth'—was denied to plaintiffs so far as this important witness was concerned. Moreover, the evil of the situation was intensified by the learned trial judge's charging the jury that the side that called a witness held him out as credible, a statement which was unwarranted where, as here, the cross-examination of the witness by defendant's counsel was improperly allowed."

This reasoning was upheld in a later case, *Okotke-wicz v. Pittsburgh Railways Co.*, 397 Pa. 303, the syllabus of which reads:

"1. Except where a party is the witness, cross-examination is limited to subject matters covered in direct examination; and the defendant may not properly introduce his defense by way of cross-examination. [306]

"2. In this case, it was Held, in the circumstances, that the court below had properly granted a new trial after a verdict for the defendant upon the sole ground that the trial judge had erred in permitting an excessive cross-examination and rebuttal testimony seeking to contradict answers improperly elicited in cross-examination. [304-8]

"3. An inquiry in direct examination which is strictly limited to one specific independent part of a conversation between the witness and another person does not open the door to cross-examination on all unrelated matters embraced by the conversation. [306]"

Judgment reversed with a venire facias de novo.

Mr. Justice Roberts concurs in the result.

Mr. Justice Jones dissents.

Mr. Chief Justice Bell and Mr. Justice Cohen took no part in the consideration or decision of this case.