# Almon v. Jackson

C.P. of Delaware County, no. 97-51563.

*Alvin F. deLevie,* for plaintiff.
*Jill R. Mezyk,* for defendant.

SURRICK, *J.,* June 20, 2000—On September 11, 1996, an automobile operated by plaintiff Dennis Almon was struck by an automobile being operated by defendant, Delaney Jackson. On June 19, 1997, plaintiff filed a complaint seeking money damages for personal injuries sustained in the accident. On November 2, 1998, the case was tried before a board of arbitrators. The arbitrators found in favor of plaintiff and against defendant and awarded damages in the amount of $22,767. Defendant filed an appeal from the arbitration award. Trial by jury was held on July 7 and 8, 1999.[1] The jury returned a verdict in favor of plaintiff in the amount of $150,000. The jury found that defendant was 90 percent negligent in the happening of this accident and plaintiff was 10 percent negligent. The verdict as molded awarded damages to plaintiff in the amount of $135,000.

A timely post-trial motion was filed. The motion requested a remittitur or in the alternative a new trial. Specifically, the motion raised the following issues:

(1) Whether the jury's verdict was excessive in light of plaintiff's evidence.

(2) Whether the court erred in allowing Dr. Wells to testify outside the "four corners" of his report.

---

1. At a conference prior to jury selection the court attempted to generate settlement discussions. Defendant refused to make any offer of settlement.

(3) Whether the court erred in allowing Dr. Wells to testify beyond the scope of cross-examination.

(4) Whether the jury's verdict on liability in favor of plaintiff was not supported by the evidence.

(5) Whether the court erred in not allowing the jury to see the police report.

After review of briefs submitted by counsel and oral argument, defendant's post-trial motion was denied. The instant appeal followed.

The evidence and testimony at trial established the following facts. Chester Pike, in the Borough of Glenolden, Delaware County, is a four-lane highway which runs generally north and south with two lanes of travel in each direction. Boon Avenue in Glenolden Borough is a two-lane highway which runs generally east and west with one lane of travel in each direction. Boon Avenue forms a "T" intersection with Chester Pike on the east side of Chester Pike. The intersection is controlled by a stop sign for traffic traveling on Boon Avenue.

Gardner Avenue in Glenolden Borough runs generally east and west and crosses Chester Pike approximately 50 yards south of the "T" intersection of Boon Avenue and Chester Pike. The intersection of Gardner Avenue and Chester Pike is controlled by a traffic light.

On September 11, 1996, plaintiff was employed as a delivery driver for Federal Express. Sometime between 3 p.m. and 4 p.m. on that date plaintiff was driving a large Fed Ex van in a westerly direction on Boon Avenue. It had been raining and the roads were wet. When plaintiff approached Chester Pike he brought his van to

a stop at the stop sign and looked toward Gardner Avenue to see if any traffic was travelling north on Chester Pike. He observed that the light at Gardner Avenue was red for traffic traveling north and south on Chester Pike and there were no vehicles traveling on Chester Pike between Boon Avenue and Gardner Avenue. After making these observations plaintiff started across the intersection with the intention of turning left to travel south on Chester Pike. As plaintiff traveled across the two northbound lanes of Chester Pike, he turned his vehicle to the left to travel south on Chester Pike. As he made this maneuver he saw the defendant, who was traveling north on Chester Pike, slide through the red light at Gardner Avenue. Defendant continued sliding out of control and into the southbound lanes of Chester Pike striking plaintiff's vehicle head-on in the centermost southbound lane. Both vehicles had to be towed from the scene. Plaintiff's Federal Express van was a total loss.

Plaintiff is a 44-year-old high school graduate. After high school plaintiff spent nine years as a military policeman in the Air Force. After being honorably discharged from the Air Force, plaintiff joined the sheriff department in his home town in Alabama. Sometime thereafter, plaintiff moved to New Jersey where for five years he worked as a maintenance superintendent. He also did work for Volunteer American in Camden. In 1994, plaintiff moved to Pennsylvania and started working for Federal Express, the job he held at the time of the accident.

Prior to the accident, plaintiff had never had any problems with his neck, shoulders or back and had never suffered any restricted motion, muscle spasm, numb-

ness or tingling in those parts of his body. Plaintiff had never suffered any disability prior to this accident and had never filed a lawsuit or made a claim for personal injury.

Immediately following the accident, plaintiff felt dizzy. After reporting the accident to his employer, plaintiff went to the emergency room at Mercy Catholic Medical Center. At that time he was experiencing dizziness, blurred vision, sharp headaches and pain. Upon discharge from the hospital, plaintiff went home. In the days following the accident the pain did not subside. He was experiencing pain in his neck, shoulders and low back and intermittent paresthesia in his upper extremities. As a result, he sought treatment at the emergency room at Kennedy Hospital on the weekend following the accident. Plaintiff did not return to work for 10 days and when he did return, he returned on what Federal Express calls TRW or temporary disability.[2] Plaintiff received medical treatment from the company doctor who referred him to a neurologist. After a period of about five weeks when the pain was not getting any better, plaintiff went to Dr. Wells, his family doctor. He first saw Dr. Wells on November 5, 1996. Dr. Wells, who testified on his behalf at trial, continued to treat plaintiff in the months following the accident.[3] Dr. Wells found that plaintiff had restricted range of motion in his neck. Dr. Wells also found muscle spasm bilaterally in the paraspinal muscles in the dorsal spine which caused a straightening of the spine as well

---

2. On temporary disability (TRW) the employee is on light duty and is permitted to work only 4 hours per day.

3. The testimony of Dr. Wells was presented by videotape.

as muscle spasm in the area of the shoulders and low back. Muscle spasm is an objective sign of injury which cannot be feigned. Dr. Wells diagnosed plaintiff as having acute cervical, dorsal and lumbar myositis. He prescribed pain medication, muscle relaxants and a course of physical therapy for plaintiff. Plaintiff made progress with the physical therapy and on January 31, 1997 he was discharged from therapy.

Although plaintiff was discharged from therapy, his injuries were not completely healed. He continued to have some difficulties with his neck and back and in April of 1997 he had a serious flare-up as a result of the duties of his employment. This flare-up sent him back to Dr. Wells for additional treatment which lasted for several months.[4]

Plaintiff has continued to have problems even up until the time of trial. He experiences muscle spasm and pain on a regular basis which is aggravated by any lifting or exertion. He has difficulty sleeping and is no longer able to do work around the house that requires any lifting. Dr. Wells testified that as a result of this accident the muscles and ligaments in plaintiff's neck and back were stretched and torn causing hemorrhaging and resulting in scarring. He indicated that, because of this, plaintiff was a candidate for easy reinjury of these areas and for degenerative changes in the future. Dr. Wells testified that plaintiff's condition was permanent, that it was caused entirely by this accident and that plaintiff's in-

---

4. As a result of this flare-up Federal Express again placed plaintiff on TRW.

jury constituted a 10 percent permanent partial disability of the cervical, thoracic and lumbar spine.[5]

Addressing first, defendant's contention that the verdict of the jury was excessive, in the case of *Ammon v. Arnold Pontiac—GMC Inc.,* 361 Pa. Super. 409, 522 A.2d 647 (1987), the Superior Court discussed the standard of review in determining whether the verdict of a jury is excessive as follows:

"We commence our discussion by recognizing that 'the granting or refusal of a new trial because of excessiveness is peculiarly within the discretion of the court below and we will not interfere, absent a clear abuse of discretion.' *Robert v. Chodoff,* 259 Pa. Super. 332, 366, 393 A.2d 853, 871 (1978). A verdict will not be held to be excessive unless the excessive size of the verdict shocks the court's sense of justice. *Id.* In *Chodoff, id.,* this court listed six factors which are considered in determining whether a particular verdict is excessive:

"(1) the severity of the injury, (2) whether plaintiff's injury is manifested by objective physical evidence instead of merely the subjective testimony of the plaintiff, (3) whether the injury will effect the plaintiff permanently, (4) whether the plaintiff can continue with his employment, (5) the size of plaintiff's out-of-pocket expenses, and (6) the amount plaintiff demanded in the original complaint."

---

5. One need only read the testimony of plaintiff and his wife to get the flavor of the impact that this accident has had on plaintiff's life. Plaintiff made a credible witness and the jury obviously concluded that his injuries were real.

Initially we would observe that the verdict in this case was not so excessive as to shock this court's sense of justice. Although the verdict was larger than anticipated, it certainly was not shocking. When one reviews the evidence and testimony concerning the accident and the injuries sustained by plaintiff in the accident, it is not difficult to understand how the jury reached its conclusions.

The impact between the vehicles was significant. As a result of that impact, plaintiff suffered severe injury to his neck, shoulders and low back. These injuries were manifested by objective, physical evidence. Plaintiff's treating physician testified that these injuries are permanent and they constitute a 10 percent disability. At the time of trial, plaintiff was only 44 years old. He will have to deal with these injuries for the rest of his life. Although plaintiff continues to work, he testified that financial considerations dictate that he work even though he continues to experience pain.[6] In fact, at the time of trial, plaintiff had already experienced a serious flare-up of his injuries as a result of his employment which required medical treatment. Dr. Wells testified that such flare-ups are to be expected.

The evidence and testimony presented by plaintiff was more than sufficient to support the jury's conclusion that plaintiff had suffered serious, permanent injury in this accident that had, and would continue to have, a significant impact on plaintiff's life. Defendant offered noth-

---

6. Plaintiff testified that even though he is in pain he does not seek medical treatment because he cannot afford to have his employer place him on TRW.

ing to contradict this conclusion. Defendant's suggestion that this verdict was the result of partiality, prejudice, mistake or corruption is totally devoid of merit.

Addressing next defendant's contention that the court erred in allowing Dr. Wells to testify outside the "four corners" of his report. Defendant contends that Dr. Wells never authored a report regarding his treatment of plaintiff for the flare-up of his condition in April of 1997 and that because he never wrote such a report he should not have been permitted to testify concerning this treatment. This objection was discussed at a conference during trial as follows:

"The Court: Okay, we are in the retiring room. Counsel are both present. We are talking about the videotaped deposition of Dr. Richard Wells, the treating physician in this matter. It is my understanding that there are two objections that the counsel needs ruling on. The one objection is page 28 is that correct?

"Ms. Mezyk: Yes.

"The Court: That has to do with whether or not the testimony of the doctor is beyond the scope of the report deposition. I have given a report which has been marked Wells-1, I guess that was on the date of the videotape. Is that the report that we are referring to?

"Ms. Mezyk: Yes.

"The Court: Counsel, perhaps you better tell me what the objection is, so that the record is clear.

"Ms. Mezyk: The objection is Dr. Wells goes to testify as to the treatment he gave, the examination he gave, the plaintiff's complaints at the time and this is the only report that we received regarding the treatment the plain-

tiff got after he was initially discharged. This report does not reference the range of motion test that he gave that Dr. Wells refers to. It doesn't reference the fact that plaintiff was complaining of lower back pain for a month because he was picking up heavy objects, although Dr. Wells testified to that. It basically just verifies that the plaintiff came back, but gives us nothing else to go on.

"The Court: This record, Wells-1 is entitled attending physician's report and it looks like something that would probably go to an insurance company. It has written on it flare-up and then has a series of dates when the examination took place. It doesn't get into what was examined. It says the patient was injured on job while driving, was hit head-on by an out of control driver. That is the report that we are referring to, correct?

"Mr. Delevie: Well actually Wells-1 is two pages. The second page identifies by date, the type of treatment, the types of charges, all by the billing codes that were routinely used. I would also point out that although it is an attending physician's report, this must be read in conjunction with and considering his reports and everything else that he had been explaining during his entire deposition up to that point.

"The Court: These are the doctor's records?

"Mr. Delevie: Right.

"The Court: Were the doctor's records given to—does defense counsel have the doctor's office records?

"Mr. Delevie: No, they never asked for them, they never subpoenaed them. They never record copied them. What they did have was a very detailed narrative report which was identified by the doctor and he testified to it.

What was marked as Wells-1 and which was admitted into evidence at the time of the arbitration hearing and it was part of the arbitration package, includes in item six the diagnosis and treating conditions. It says it is a result of the accident. It notes it is a flare-up and the second page of Wells-1 details by code. Counsel certainly could have obtained those codes, they are readily available. What the diagnoses were, what the treatments were for. Again, it is within the fair scope of the four corners of the report.

"The Court: Just a minute. Counsel, did you—do I understand that you never got the doctor's records in this case?

"Ms. Mezyk: We got records up through January 31, 1997. We got his written reports and the bills. Then we got this one bill, which they are referring to as a report, but seems to be a bill.

"The Court: Well it is a bill with attached codes and dates of treatment and charges, correct?

"Ms. Mezyk: Correct.

"The Court: Okay.

"Ms. Mezyk: My objection, though, is that the doctor testified outside the scope of this report. Because he refers to complaints of lower back pain for a month. He testifies to a lot outside the scope of this report, even though I knew what those codes meant.

"The Court: When did you receive this document?

"Ms. Mezyk: I am not sure, but I would agree—I mean if counsel said he gave it to me at the arbitration I don't agree with that.

"Mr. Delevie: It was admitted at the arbitration, and I know it was submitted well in advance of the arbitration so it was admissible.

"The Court: There was testimony at the arbitration?

"Mr. Delevie: Yes.

"The Court: Did Dr. Wells appear?

"Mr. Delevie: No the client testified.

"The Court: Okay, anything further?

"Ms. Mezyk: No.

"The Court: Okay, under the circumstances, I am going to overrule the objection and permit the testimony." (N.T. 7/7/99 at 127-33.)

In the case of *Chanthavong v. Tran*, 452 Pa. Super. 378, 682 A.2d 334 (1996), the Superior Court discussed the scope of an expert's testimony as follows:

"This court has recently set forth the applicable law regarding the scope in which an expert witness may testify as to his or her pretrial report as follows:

" '[E]xperts may testify at trial concerning matters which are within the fair scope of a pretrial report.' . . . 'The avoidance of unfair surprise to an adversary concerning the facts and substance of an expert's proposed testimony is the primary purpose of the rule requiring that testimony be within the fair scope of the pretrial report.'. . .

"[i]t is impossible to formulate a hard and fast rule for determining when a particular expert's testimony exceeds the fair scope of his or her pretrial report. Rather, the determination must be made with reference to the particular facts and circumstances of each case. The con-

trolling principle which must guide is whether the purpose of Rule 4003.5 is being served. The purpose of requiring a party to disclose, at his adversary's request, 'the substance of the facts and opinions to which the expert is expected to testify' is to avoid unfair surprise by enabling the adversary to prepare a response to the expert testimony. . . .

"('[W]e have found experts' reports to be adequate . . . when the report provides sufficient notice of the expert's theory to enable the opposing party to prepare a rebuttal witness.')

"In other words, in deciding whether an expert's trial testimony is within the fair scope of his report, the accent is on the word 'fair.' *The question to be answered is whether, under the particular facts and circumstances of the case, the discrepancy between the expert's pretrial report and his trial testimony is of a nature which would prevent the adversary from preparing a meaningful response, or which would mislead the adversary as to the nature of the appropriate response." Id.* at 388-89, 682 A.2d at 339-40.

In the instant case there was no unfair surprise concerning the substance of Dr. Wells' testimony. Defendant knew that plaintiff had gone back to Dr. Wells in April of 1997 because of a flare-up in his condition. Plaintiff had testified as to the flare-up and the resulting visits to Dr. Wells at the arbitration trial. Defendant had Dr. Wells' records which designated the dates of plaintiff's treatment and the codes indicating the types of treatment that he received. These records had been given to defendant at the time of the arbitration trial. If defendant had felt the need for additional information concerning the

treatment that began April 1997, he could have sought clarification by way of interrogatories or a request for a supplemental report. Defendant did nothing. Now defendant claims surprise. If defendant was surprised he has no one to blame but himself. This is not a case where plaintiff misled defendant.

Addressing next defendant's contention that the court erred in allowing Dr. Wells to testify beyond the scope of cross-examination. On direct examination, Dr. Wells testified that he had reviewed the records from Kennedy Hospital, was familiar with the complaints that plaintiff made to the emergency room personnel at Kennedy and considered this in reaching his conclusions. On cross-examination, counsel for defendant did not make specific reference to plaintiff's visit to Kennedy Hospital. On redirect, plaintiff's counsel asked Dr. Wells questions concerning the Kennedy visit. Defendant objected to this inquiry as being beyond the scope of cross. The record reflects the following with regard to this objection:

"The Court: . . . The next one is 46. This has to do with an objection to a question beyond the scope of the cross-examination?

"Ms. Mezyk: Correct.

"The Court: Counsel, perhaps you had better, for the record, explain exactly what it is.

"Ms. Mezyk: On cross-examination of the doctor, the attorney, Keith Goner, who was actually doing the doctor's deposition referenced the first emergency room report from Mercy Catholic Medical Center. The name of the report is on page 41. On redirect to the doctor, counsel tries to bring up the Kennedy Memorial Hospi-

tal Emergency Room Record, and that report was never referenced on cross-examination.

"The Court: Has he ever discussed treatment—Kennedy was not discussed?

"Ms. Mezyk: Right.

"The Court: Counsel, do you agree with that?

"Mr. Delevie: In words, yes, but it is misleading. What Mr. Goner was attempting to do in cross-examination by references to the treatment at Mercy Catholic was to suggest that when he went to the emergency room at that point, that Mr. Almon was not complaining about his neck or trapezious area. I am trying to have the jury conclude that somewhere down the road, all of a sudden Mr. Almon started to make these complaints. I thereupon direct examination give the jury a full viewpoint brought out that, in fact, two days later, at another emergency room he truly did complain about shooting pains in the trapezious area so that they would have a complete picture, and not just have it pot shotted to show that one ER did not make reference to it but certainly two days later, did. So although the emergency room record was not mentioned by name, JFK, it was certainly fair redirect to rebut the inference that counsel was trying to make that this trapezious area somehow mysteriously appeared sometime later.

"Ms. Mezyk: Dr. Wells had full opportunity to direct that Kennedy room record on direct examination. So the fact that . . .

"The Court: Dr. Wells had reviewed the Kennedy record, was familiar with it, it was part of his things that he reviewed in preparation for testimony?

"Ms. Mezyk: Yes.

"The Court: Anything further?

"Mr. Delevie: No, just that I think—well, your honor understands my position on the matter.

"The Court: Under the circumstances, I am going to overrule that objection and permit that testimony also." (N.T. 7/7/99 at 133-36.)

In the case of *Woodland v. Philadelphia Transportation Company,* 428 Pa. 379, 385-86, 238 A.2d 593 (1968) the Supreme Court observed:

"It is elementary that, unless the witness is himself one of the litigants . . . cross-examination of his testimony should be confined to the matters upon which he was examined in chief. This has been the rule in Pennsylvania since it was proclaimed by Chief Justice Gibson in 1827 in *Ellmaker v. Buckley,* 16 S.&R. 71, . . . and it has been consistently adhered to ever since[.] . . . It is true that considerable latitude must be left to the trial judge, and his action will not be reversed in the absence of an abuse of discretion or unless obvious disadvantage resulted therefrom to the other party."

In the case of *Catina v. Maree,* 498 Pa. 443, 449, 447 A.2d 228, 231 (1982) the Superior Court made the following observations with regard to the examination of witnesses:

"As a general rule, one who calls a witness is required to elicit on his first (direct) examination all that is wished to be proved by that witness—such rule is manifestly in the interests of fairness and expedition of litigation. McCormick, Evidence section 32, Redirect and Subse-

quent Examinations (West 2d Ed. 1972). While there is division of authority on the scope of cross-examination between jurisdictions favoring restrictive cross (as in Pennsylvania: see generally, *Kline v. Kachmar,* 360 Pa. 396, 61 A.2d 825 (1948) and those allowing 'wide-open' cross, no such division exists as regards redirect and subsequent examinations; as to these subsequent examinations, the practice is uniform that the party's examination is limited to answering *only* such matter as was drawn out in the immediately preceding examination of the adversary." (emphasis in original)

We are satisfied that there was no abuse of discretion in the instant case. Counsel for defendant questioned Dr. Wells concerning the fact that plaintiff did not complain of neck pain when he went to the emergency room on the day of the accident, the implication being that plaintiff had not injured his neck in the accident. Plaintiff's counsel on redirect established that on the weekend following the accident, plaintiff did go to Kennedy Hospital complaining of neck pain and that it is not unusual for such pain to develop in the days immediately following an accident. This redirect was not beyond the scope of defendant's cross.

Finally, addressing defendant's contentions that plaintiff presented insufficient evidence to establish liability and that the court erred in denying the jury's request to see the police report, the simple response is that these contentions are frivolous.

Jurors may believe all, some or none of the testimony of any witness. *Martin v. Evans,* 551 Pa. 496, 711 A.2d 458 (1998). It is the function of the jury to weigh com-

peting evidence and that function should not be disturbed by the trial court. *Wagner v. Anzon Inc.*, 453 Pa. Super. 619, 684 A.2d 570 (1996). Clearly the jurors in this case believed the testimony of plaintiff and rejected the testimony of defendant with regard to the happening of this accident. The testimony of plaintiff fully supports the conclusion that defendant was at least 90 percent negligent in the happening of this accident.

With regard to the police report, during the course of his testimony, Officer Kelly, the investigating officer from the Glenolden Police Department, made reference to information contained in his police report. During the cross-examination of plaintiff, counsel for defendant had the police report marked as an exhibit (D-2) and questioned plaintiff with regard to certain items in the report. After the jurors had retired to deliberate, they requested that the court give them the police report. Plaintiff objected. The objection was sustained. Defendant contends that this was an error.

The entire police report was never read to the jury during trial. Only selected portions of the report were used during the testimony of Officer Kelly and Dennis Almon. The report contains information that the jury had not seen or heard. For example the name of plaintiff's insurance company and defendant's insurance company are in the report. In addition, a diagram of the accident scene drawn by Officer Kelly is in the report. Clearly it would have been improper to give this information to the jury. Defendant's contention is without merit.

For the forgoing reasons, defendant's post-trial motion was denied.